[Civ. No. 4640.   Fourth Dist.   Feb. 17, 1954.]

N. M. GILMORE, Plaintiff and Appellant, v. R. E. HOFF-
MAN, SR., et al., Defendants and Appellants; L. A.
CREWS, Respondent.

Burford & Hubler and Walter E. Burford for Plaintiff and Appellant.

West, Vizzard, Howden & Baker and James Vizzard for Defendants and Appellants.

John R. Berryhill for Respondent.

GRIFFIN, J.—Plaintiff, cross-defendant, respondent and cross-appellant (hereinafter referred to as plaintiff) in 1948, under the terms of a written share-rent lease, leased two 80-acre parcels of land from P. C. Weaver and wife for the purpose of farming cotton and re-leased this acreage again on March 10, 1949. After the execution of the last lease the Weavers sold the 160 acres to defendants, cross-complainants, appellants and cross-respondents R. E. Hoffman, Sr., and wife, and R. E. Hoffman, Jr., and wife, and Enid T. Crews, and defendant, cross-complainant, respondent on cross-complaint, and cross-respondent on cross-complaint L. A. Crews, individually and as copartners doing business as Hoffman Cotton Company (hereinafter referred to as defendants).

By the terms of the written lease assignment dated April 1st, 1949, they did "promise and agree" to comply with all the terms, covenants and conditions imposed upon the Weavers as lessors.

A pumping plant was in operation on each 80-acre parcel. The written lease provided, among other things, that:

". . . lessee agrees to farm to cotton all of the tillable land located on the herein described property and to deliver to the lessors, as rent, one-fifth (1/5) of all cotton and cotton seed produced thereon."

The main contention arising in this case involves the paragraph reciting that:

"It is understood and agreed by and between the parties hereto that the well and pumping plant located upon said premises now produce sufficient water for the irrigation there-

of. The lessors agree that in the event the water level underlying said premises shall lower to such a depth as to materially decrease the supply of water that can be produced by the well and pumping plant, or the said pumping plant shall fail to properly operate and pump, without any fault on the part of the lessees, his agents or servants, that the lessors will, within a reasonable time after being notified of the condition and after receiving written request from the lessee that the situation be remedied, deepen the well or lower the pump therein, or to do such other things as may be necessary to increase the supply of water that can be produced by the said well and pumping plant to an amount as nearly equal to that now being produced as is reasonably possible; nothing herein contained to be construed as making the lessors guarantors of water at all times, but only to use their best efforts to see that there is sufficient water to irrigate said property."

It appears that the pumping plant furnishing water for irrigation of the east 80 acres failed through no fault of the plaintiff on June 20, 1949, and at that time plaintiff had growing upon that acreage a thriving crop of cotton and, according to the evidence, under normal conditions, with water to irrigate, it would have produced not less than an average of $1\frac{1}{4}$ bales of cotton per acre. It appears that the defendants were notified and had knowledge of the failure of said well and pumping plant; that they came to the property, made examination, and were fully advised of the need existing and instructed plaintiff not to worry, that they would take care of providing for the repair of it. The testimony shows that the defendants were experienced cotton people, knew and were advised that it required ample water for the production of cotton crops; that plaintiff's crops were then in condition to require irrigation and if water was not applied the result would be a loss of the crops to plaintiff.

It appears that as a result of the failure of the well and pumping plant plaintiff's crops growing on the east 80 acres failed in part and his loss therefrom was estimated to be $75\frac{1}{2}$ bales of cotton, resulting in a net los to plaintiff of $8,-682.50, being $75\frac{1}{2}$ bales at $115 per bale (or $160 per bale less $45 cost).

Plaintiff's crops, according to plaintiff's testimony, failed to receive any irrigation on the east 80 acre tract from June 20, 1949, to August 8, 1949, being a period of one month and 18 days. The evidence indicated that the loss of the crops sustained by plaintiff was occasioned by reason of the

breakdown of the well and pumping plant and failure of the defendants to make available for plaintiff's use on the premises water for irrigation of said crops during said 48-day period.

Plaintiff takes the legal position that under the lease, if the well or pumping plant failed or there should be any substantial diminution of the water supply, defendants were obligated to do such other things as might be necessary to increase the supply of water, and their failure to do so showed a lack of diligence on their part resulting in the claimed damages. The court found generally in accordance with the facts stated.

It is defendants' contention that although the evidence does show that they encountered difficulty with the pump and well and plaintiff was not able to obtain the supply of water from it for a period of time up to July 27th, they did, after receiving notice of the condition, exercise reasonable diligence in an endeavor to place it in operation, but through no fault of their own they were unable to do so and accordingly they complied with the terms of the lease which did not require them as guarantors to furnish water at all times but only to use their best efforts to see that there was sufficient water to irrigate said property, and that the evidence conclusively shows this and accordingly the finding of the trial court is not supported by the evidence.

Defendant Hoffman, Sr., testified that the cause of the breakdown was due to obstruction in the well, and that he immediately employed the Pixley Hardware Company to pull the bowls out of the well; that it tried to remove the obstruction but informed him it could not be done; that thereafter he secured the B & B Drilling Company to attempt the repairs, and after working on it for two days, June 28th and 29th, 1949, they were unable to rectify it; that one Elvis asked him if he could attempt to remove it but he found that he could not; that after two days of trial he authorized him to drill a new well; and that during the middle of July the drilling of a new well was commenced and completed by July 27th.

Plaintiff testified that it was not commenced until July 27th; that the casing was delivered on that date; and it was not completed until August 8th. By stipulation of counsel it was agreed that there was a record of a steel company indicating that some casing was delivered at the site on July 15th and the balance on July 19th. The records of the electric company showed that there was a power hookup installed for

the new pump and well on July 27th, and Elvis was paid for the drilling on that date.

The contention is that the evidence conclusively shows that defendants exercised reasonable diligence in repairing the old well; that the agreement did not require the drilling of a new well, but if it did, they were not lacking in any diligence in procuring it; that the finding of the court that defendants were negligent and had breached the lease agreement is not supported by the evidence.

Plaintiff contends that the full import of the agreement was that defendants would use "their best efforts to see that there was sufficient water to irrigate said property"; that since they mutually agreed there was sufficient water to irrigate the land when the lease was executed, and wherein plaintiff was required by its terms to farm all tillable land to cotton, defendants must have known that plaintiff's ability to comply with the agreement required an ample supply of water, and since that was the only source of water, accordingly they were obligated to do everything necessary or reasonably possible to furnish a supply of water equal to that then being produced; that the evidence conclusively shows that they failed to supply any water to the 80 acres involved between June 20th and August 8th, 1949, and accordingly ordinary diligence was not exercised and a partial crop failure resulted.

It is conceded that the main crop failure was due to lack of supply of water. An examination of the reporter's transcript shows that the plaintiff Gilmore testified he planted his cotton crop in the early part of April, 1949, and in June he fertilized it; that defendants changed from gas pumps to electric pumps; that his crop needed irrigation on June 20th, and after running the electric pump on the east 80 acres for a period of time, a shaft that turns the bowls broke; that he immediately, on June 21st, told the defendant Crews of this condition, and Crews sent plaintiff to defendant Hoffman, Sr., and he reported that fact to Hoffman; that Hoffman said he would have one Simeral fix it; that Simeral came out and tried to repair it and could not; that he told plaintiff the bowls had broken off and fallen into the well; that later, on June 28th, the B & B Drilling Company came out and the bowls came out of the well with the pump and apparently did not break off as indicated by Simeral; that the workmen said they would return the next morning; that plaintiff's cotton crop at that time was very much in need of water; that on

the 29th Hoffman came out and examined conditions and said the well had collapsed and that he was not going to drill a new well and he would not fix the old one because he wanted to put down a 900-foot well when he drilled a new one; that he told Hoffman the crop would not mature without water and Hoffman said he could not put a new well down at that time; that later on he again went to Hoffman and asked him to try to do something about it; that Hoffman studied a little bit and said a man named York might be able to repair it and told plaintiff to go and see him; that plaintiff sent York to see Hoffman and York came out about July first and tried to put a pump in the well without success; that plaintiff looked down the well with a glass and saw that the hole was free and open ·to the water; that no other workmen came out after that so, on July 8th, he sent defendants a written notice of the defective condition, with a request to make the necessary repairs; that about July 25th or 27th, defendants started drilling a new well and it took eight days to bore it, and on August 6th, some sand was pumped out and water was not obtainable until August 8th; that in the meantime his crop was "burned up"; and that Hoffman stated it looked "burned up" when he examined it at the time he commenced drilling the new well. He further testified that in August, 1949, defendants lowered the well on the west 80 acres about 20 feet, and put new bowls on the pump due to defective pumping conditions after the change over to electric pumps. Plaintiff was positive from his records that no casing was delivered to the well until July 26th, and that the well was not started until July 25th, and that no water was available to him until August 8th. This later date receives some corroboration in the testimony of another witness who testified he visited the property two days after July 26th, and the drilling rig was still operating.

It therefore appears that there is a conflict in the evidence between that related by the plaintiff and that produced by the defendants in relation to the time when the casing was delivered and when the well was completed and water was produced. It is defendants' contention that the testimony of the plaintiff, although positive in form, was completely destroyed by the production of the receipts, the checks, and the testimony of defendants' witnesses, and that therefore plaintiff's testimony was of no weight and should be disregarded in this respect, citing such cases as *Elliott* v. *Market Street Ry. Co.*, 4 Cal.App.2d 292 [40 P.2d 547], and *Burns*

v. *Faget Engineering Co.,* 53 Cal.App. 762 [200 P. 818]. We see no merit to this contention. ▉ It is within the province of the trial court to determine what weight and credit shall be given to the testimony of any witness unless the testimony creating the conflict is so inherently improbable of belief as in effect to constitute no evidence at all. (*Romero* v. *Eustace,* 101 Cal.App.2d 253 [225 P.2d 235]; *People* v. *Miller,* 114 Cal.App. 293 [299 P. 742].) The testimony creating the conflict in this respect cannot be said to be unreasonable and inherently improbable.

The claim that the defendants were not under obligation to drill a new well under any conditions of the agreement and that their willingness to do so was purely voluntary is not sustainable. By the agreement plaintiff agreed to farm the land. It was agreed that plaintiff then had a sufficient supply of water to irrigate it and that if the water supply from said wells failed defendants would, within a reasonable time after notice, deepen the well or lower the pump therein or "do such other things as may be necessary to increase the supply of water that can be produced by the said well and pumping plant to an amount as nearly equal to that now being produced as is reasonably possible." It is clear that the intent of the agreement was to keep plaintiff supplied with water for the purpose indicated. Defendants could not satisfy the terms of the agreement by merely making two or three unsuccessful attempts to correct the failure of the wells to produce the amount of water agreed upon and then abandon further attempts to produce water or to further remedy the situation. While defendants did not guarantee to make water available to plaintiff "at all times" the inference is that they intended to guarantee water to him at least some of the time, allowing a reasonable time in case of a breakdown that they may be afforded an opportunity to "do such other things as may be necessary" to increase the supply of water to that which ordinarily had been produced by that well. We conclude that there is no merit to this contention.

The real question is whether defendants used their best efforts to see that there was sufficient water to irrigate the property in accordance with their agreement. As it appears now, their best efforts would have been to drill a new well when it was first discovered, about June 21st, that such action was necessary. The delay and unsuccessful efforts in doing other exploratory work and in trying to obtain satis-

factory results from further attempted repairs concededly was not chargeable to plaintiff. ▪ Whether defendants took the proper course, obtained proper counsel and advice, and acted wisely and timely and used their best efforts under the circumstances to correct the condition was a factual question for the trial court to determine. Its finding on this question, under the evidence, cannot be disturbed on appeal. (4 Cal. Jur.2d 481, § 602; *Henika* v. *Lange*, 55 Cal.App. 336, 339 [203 P. 798]; *McCready* v. *Bullis*, 59 Cal.App. 286 [210 P. 638]; *Woolford* v. *Electric Appliances, Inc.*, 24 Cal.App. 2d 385 [75 P.2d 112].)

Some contention is made by defendants that no breach of the agreement was chargeable to defendants because, by its terms plaintiff was required to notify defendants "in writing" pertaining to the condition of the pump, and demand that the situation be remedied; and that oral notice was insufficient, citing such cases as *Monson* v. *Fischer*, 118 Cal.App. 503, 519 [5 P.2d 628].

▪ Defendants concede that the evidence shows that they were orally notified of the condition and that they had actual knowledge and notice of it and that a request was made to remedy the situation; that they thereafter inspected the condition and did make some effort to correct it. It is plaintiff's testimony that when defendants refused to act further and drill another well for the production of water, he did, on July 6th, send written notice of the condition, and stated that he had previously reported the trouble to them and requested them to remedy the condition. The court so found. Under the facts related defendants would be estopped to claim any rights by failure of plaintiff to serve defendants with written notice of the conditions in the first instance. Their actual knowledge was equivalent to notice, particularly where, as here, they acted upon the oral notice and thoroughly understood the situation, were not relying upon any such written notice, and apparently waived it. ▪ A provision in a contract pertaining to written notice may be waived, either expressly or by conduct, by the party for whose benefit it is inserted. (*Daly* v. *Ruddell*, 137 Cal. 671 [70 P. 784].)

▪▪ The next complaint involves the amount of damages awarded to the plaintiff and to the cross-complainant L. A. Crews. By plaintiff's complaint, he seeks judgment against defendants for their breach of the agreement, and alleges that the difference between the number of bales which would ordinarily have been produced on said land and the

number actually produced was 139½ bales, worth the gross sum of $22,320; that after deducting the cost of picking and delivering, etc. he was damaged in the sum of $12,046.

Defendants, doing business as Hoffman Cotton Company, answered and denied generally the allegations of plaintiff's complaint, and by way of a cross-complaint against plaintiff, sought the recovery of one-fifth of all cotton and cottonseed produced by plaintiff on both 80-acre tracts as rental. They alleged that plaintiff sold the 1949 crop from both 80-acre parcels for $8,208.16, being the amount realized from the production of 61 bales of cotton grown on said land by plaintiff that year; and further alleged that one-fifth of the crop amounted to $1,641.63, and that said sum was an offset against any claimed damage allowed plaintiff; that if a judgment was given plaintiff for $22,320, or any portion of it, defendant should be allowed an offset of 5 per cent on that amount as rental, plus the $1,641.63, as alleged.

Defendant and cross-complainant L. A. Crews, by separate cross-complaint, alleged that the defendant Hoffman Cotton Company, in a partnership settlement, assigned to him all accounts receivable pertaining to their joint venture and partnership and accordingly he asked the court to determine that he was entitled to the $1,641.63 claimed by the defendant company for crop rental due from plaintiff to the company. He attached to his cross-complaint a copy of the alleged dissolution agreement and assignment.

At the conclusion of the trial the court found generally in respect to the damage that plaintiff planted 150 acres of cotton on the two parcels, and that on June 20, 1949, the crop was growing and was in a healthy condition; that on that date, on the easterly portion, at least 70 acres had been planted to cotton; that the pump broke down and the well failed to produce water; that the crops growing thereon sustained a loss in production consisting of 75½ bales; that 35 per cent of said loss was attributable to defendants' breach of the terms of the lease and their negligence in failing to repair the well and pump for the period from June 20th to August 8th, 1949; that the reasonable net market value of the portion of the cotton crop lost by plaintiff was $3,038.87; that defendants would be entitled to one-fifth rental therefrom, totaling $607.77, resulting in a net loss to plaintiff of $2,431.10; that plaintiff received $8,208.16 for cotton marketed from the entire leased premises, and defendants were entitled

to one-fifth thereof, as rental, totaling $1,641.63; that since defendants' rights to said rents were assigned by the Hoffman Cotton Company to L. A. Crews prior to the filing of the complaint herein, Crews was entitled to receive said sum of $1,641.63 from plaintiff as an offset against the judgment rendered against him. Judgment was given for plaintiff against defendants for $2,431.10.

Plaintiff Gilmore appealed, claiming that the court should have awarded him the entire loss of $8,682.50 claimed to have been sustained by him, less the one-fifth rental. Defendant Hoffman Cotton Company appealed and claims that not only was there no breach of the agreement, but that the judgment is not supported by the evidence; that it was error to give judgment to Crews on his cross-complaint because the crop rental should be used as an offset against the judgment in favor of plaintiff and against all defendants; that the court erred in admitting and excluding certain testimony and that the damage found is not based upon any substantial evidence.

The evidence pertaining to crop damage may be thus summarized. Plaintiff testified he compared the 1949 returns with the returns from the crop he obtained in 1948, from the same acreage, without fertilization, and from this comparison he estimated the crop return he should have received in 1949, with fertilization, at a bale and a quarter per acre. He then stated that the only crop return on the east 80 in 1949, due to burn from lack of water after fertilization, was the picking of 12 bales of bolls, and that they were ginned, but no standard grade cotton matured on that parcel; and that the price of the bolls was much lower than regularly developed cotton.

Other witnesses testified that they were familiar with the property and had observed the condition of the cotton crop on June 20th, 1949; that both 80-acre parcels had a fair stand of cotton, and if cared for in the normal manner should have produced at least a bale of cotton per acre. Other witnesses testified that it might produce 1¼ bales per acre. One witness testified he handled and held the mortgage on the crop actually obtained and that the two 80-acre parcels produced 61 bales of cotton, weighing 29,351 pounds, but that the number of bales of bolls was not separately indicated in this return but the gross return of the 61 bales of cotton was $8,206.16; that the production from the two 80-acre parcels in 1948 was 111 bales. He testified that about July 25, 1949, after the water supply failed on the east 80, there

was a difference between the crops on the two 80-acre parcels as to its size and the west 80 was more prolific, i.e., it was normal and the east 80 was subnormal. He then stated that the average cost of producing and delivering a bale of cotton in that district was about $50 per acre, and the ginning cost would run about $10 per bale; that picking would estimate $45 per bale; that when he observed the east 80 about July 28th, a well-drilling outfit was operating on it; that later, when the water was being pumped from it again, he observed the cotton thereon averaged about 12 inches in height and that on the west 80 it was about 30 inches. A qualified expert testified that if the crop went without water from June 20th to July 10th there would have been about a 5 per cent damage; from July 10th to July 15th an additional 10 per cent damage; from July 15th to July 20th, an additional 25 per cent damage; from July 20th to July 31st, a 40 per cent additional damage; and from July 31st to August 8th, an additional 10 per cent. He then testified generally to the habits in reference to the growth of cotton and the resultant damage from lack of water, particularly where a fertilizer had been applied.

Plaintiff's claim that there was a complete destruction of his crop on the east 80-acre parcel due entirely to defendants' negligence is not borne out by the record. The court found that as to the east 80-acre tract, there was a total loss of 75½ bales of cotton, as compared to the previous year, and that only 35 per cent of that loss was attributable to defendants' negligence. It also found that there was a crop loss on the adjoining 80-acre tract where there was sufficient water supplied by defendants, but found that such loss was not attributable to defendants' negligence. The agreement does not provide that defendants should guarantee water "at all times," but provides for temporary breakdowns and that defendants might not be liable for crop damage during such reasonable periods, even though some damage might result. To sustain plaintiff's contention it would be necessary to construe the agreement to mean that it provided an absolute guarantee of water "at all times." It does not so provide. We cannot say, as a matter of law, that plaintiff was entitled to the full amount of claimed damage, particularly where the evidence justifies the conclusion that all of the damage claimed was not due to defendants' negligence. The percentage of crop damage for lack of water, for the dates indicated by the expert witness, add support to this con-

clusion. No prejudicial error resulted in admitting this testimony, as well as the testimony of plaintiff, the owner, as to estimated crop damage, nor in denying admission of certain other testimony about which defendants complain. The evidence fully supports the award of damages allowed to plaintiff.

The judgment allowing Crews the sum of $1,641.63 on his cross-complaint, as an offset on the judgment rendered against him, rather than an offset against the judgment obtained against defendant Hoffman Cotton Company, including Emma T. Crews, is supported by the evidence under the theory that the one-fifth crop rental due from plaintiff to the partnership was one of the accounts receivable of the partnership or joint venture at the time of its dissolution on April 20, 1951. It provided for its dissolution and, among other things, that the Hoffmans do hereby "transfer and assign to . . . Crews . . . all of the accounts receivable of said joint venture . . . " However, in this connection, a separate assignment was made by the Hoffmans on May 18, 1951, assigning "those accounts of the Hoffman Cotton Company . . . referred to in their agreement." These accounts receivable are set forth in an attached list as being accounts shown on the books of the company. This list does not mention the account of N. M. Gilmore. However, we conclude that assignment in the agreement was sufficient to cover the account here in question.

No prejudicial error appears and the evidence supports the findings and judgment rendered.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.

Defendants' and appellants' petition for a hearing by the Supreme Court was denied April 14, 1954.