[Civ. No. 10776. Third Dist. May 18, 1964.]

BURGERMEISTER BREWING CORPORATION, Plaintiff and Appellant, v. CLYDE A. BOWMAN, Defendant and Appellant.

P. M. Barceloux, Burton J. Goldstein, Goldstein, Barceloux & Goldstein, Hoffman, Davis & Martin and Elbert W. Davis for Plaintiff and Appellant.

Grayson L. Price and J. Albert Hutchinson for Defendant and Appellant.

PIERCE, P. J.—This litigation commenced in 1954. Plaintiff ("Burgermeister") filed a complaint against defendant ("Bowman") for $18,027.14 for beer sold and delivered. Bowman's answer admitted the indebtedness but he cross-complained for damages for Burgermeister's repudiation (by premature termination) of a beer distributorship contract. A first trial and jury verdict for Bowman on his cross-complaint was appealed by Burgermeister and reversed and remanded for retrial for error in instructions. (*San Francisco Brewing Corp.* v. *Bowman,* 52 Cal.2d 607 [343 P.2d 1].) In the first trial Bowman had claimed (1) an implied, and alternatively (2) an express contract. On retrial Bowman by amendment pleaded an express oral contract with express termination provisions exclusively. Verdict after the second trial was for Bowman for $46,000.[1]

The principal amount of the admitted beer account owed Burgermeister was offset against this. In addition, the judgment debited Bowman with interest. Burgermeister appeals from the damage award on Bowman's cross-complaint. The latter appeals from the allowance of interest.

On the appeal of Burgermeister we hold (1) that substantial evidence at the second trial supports the jury's implied finding that there existed between the parties an oral contract creating a beer distributorship for an expressly agreed-upon term, to wit: as long as Bowman should continue to use his best efforts to promote and solicit the sale of the brewery's products and "took care of the territory"; that Bowman, on his part, had performed the agreement for 19 years, incurring substantial expense and providing facilities to build up a valuable distributorship for the marketing of the brewery's beer. (2) Such a contract is not one lacking mutuality; it is not illusory. It is not terminable at will. (3) It was not within the statute of frauds as a contract which by its terms must endure beyond one year. (Code Civ. Proc., § 1973, subd. 1.) (4) Decision on the previous appeal of this case does not establish a "law

---

[1] The first jury had awarded him $36,040.

of the case" contrary to the conclusions reached above. (5) The trial court did not erroneously instruct the jury either on the issues relating to liability or regarding damages.

The appeal of Bowman attacking an allowance to Burgermeister of $9,937.48 interest must be sustained. Although Bowman was not entitled to prejudgment interest on his unliquidated claim for breach of contract damages, when the amount of Bowman's damages had been determined and was offset against appellant's claim this prevented interest from accruing on the latter.

### Appeal By Burgermeister

The events out of which the contract in litigation arose began late in 1935 or early in 1936, when defendant was a partner with his father in the business of distributing carbonated beverages. At that time Burgermeister, then San Francisco Brewing Corporation, through its president and credit manager, entered into an oral contract with Bowman and his father under which the Bowmans were to sell the brewery's products. The distributorship was to be exclusive in Butte County, except in the towns of Gridley and Biggs. According to Bowman's testimony, duration of the contract was provided for as follows: "Mr. Lunsmann told me on that occasion that if I took on their product, and built that product up, that I would have all of the beer that I needed from that brewery as long as I took care of the territory and did a good job ... he assured me that I would have an exclusive territory." The testimony of Burgermeister's credit manager in this regard was: "A. Well, something to the effect as long as he could sell satisfactorily why it should be his exclusive territory, that is correct. Q. Well as to satisfaction, that was to do a satisfactory job? A. Yes, that is right."

This witness also testified there was no quota fixed, that Bowman's only obligation was to dispose of "all he could sell by using his best efforts." Performance commenced immediately after this conversation.

At the time the brewery marketed two brands, "Golden State" and "Pilsen Gold." In 1937 these were discontinued and the brand "Burgermeister" was substituted. Bowman continued to sell this brand until the termination of the contract.

The ownership of the distributorship business went through a number of transmutations during the 19 years which followed the agreement's inception. In 1937 the father

and son partnership was dissolved and the son continued as an individual proprietor until 1942, when a second partnership with two others was formed. Later one of these partners withdrew and in 1950, according to Bowman, Burgermeister's manager instructed him "to get rid of" his other partner. Bowman complied and continued in business as an individual until the brewery's termination of the contract in June of 1954.

As stated above, over the years Bowman (in addition to buying out the unsatisfactory partner) was required to and did do the following things: (1) He bought a new line of expensive trucks "painted Burgermeister colors" and with "Burgermeister signs on them exclusively." (2) He received and handled deliveries of beer which had been "palletized." This involved handling with forklift units. (3) Burgermeister's advertising program became increasingly extensive and commencing in June 1950 Bowman (and other distributors) were required to contribute a cent and a half a case to the brewery's advertising fund. (4) Until 1953 or 1954 Bowman had been permitted to and had distributed Acme beer as well as Burgermeister; Burgermeister then required Bowman to discontinue this. Bowman complained: "[F]rom time to time you fellows have shoved all kinds of things down my throat," but acceded to the brewery's demand when he was assured no further demands were going to be made. The brewery representative promised "[w]e feel that everything will be very fine then, and we will just go along as we have in the past."[2] (5) In 1953 the brewery adopted a policy of operating its plant at maximum capacity on a year-round basis and Bowman was required to accept an allocated increased quantity of beer unsalable in winter. The augmented inventory had to be stored, necessitating the construction of a new warehouse and the building of an addition on the existing warehouse. The cost: $27,500. (6) In 1954 to increase sales, Bowman was also required to, and did, employ one Clyde Lindstrom to handle sales promotion. Almost im-

---

[2]We quote this conversation in some detail in answer to the argument of Burgermeister that no proof supports the contention of Bowman that there was an express contract having a duration provision *after* Bowman's last partnership had been dissolved and he was transacting business as an individual. The conversation related was more than an *act* of reaffirmance of the 19-year-old promise that the contract would endure as long as Bowman faithfully "covered the territory." The reassurances given were *words* which a jury might, and this jury did, accept as an express continuance of the old contract with its duration obligation.

mediately thereafter Burgermeister terminated Bowman's distributorship without notice. The only explanation given was the brewery didn't like Bowman's operation.

Burgermeister contends that this contract was illusory—lacking mutuality—because it bound the brewery by its promise to keep effective the distributorship as long as Bowman exerted his best efforts to sell the brewery's beer and "took care of the territory" but that there was no corresponding promise on the part of Bowman to exert his best efforts or to "take care of the territory." Substantial space is devoted in the briefs of both parties to discussion of whether the evidence had or had not shown such a promise on the part of Bowman and also whether a statement made by Bowman's attorney in a colloquy between counsel during the course of the trial constituted a stipulation that Bowman had in fact given no promise of faithful and satisfactory service. We find determination of this factual issue immaterial.

It is true that "a promise which in terms reserves the option of performance to the promisor is insufficient to support a counter-promise." (1 Williston Contracts (rev. ed.) § 105, p. 417; 1A Corbin on Contracts, § 163, p. 76; *Mattei* v. *Hopper,* 51 Cal.2d 119, 122 [330 P.2d 625].) But this is a rule applicable to contracts wholly executory and, as stated by Professor Corbin (*op. cit.,* p. 76): "In every case of this kind, however, the agreement should be scrutinized carefully to see whether the promisor *did not give some consideration that was not affected by his power to cancel,* and also whether there has not been a part performance that makes up for the defects of the consideration." (Italics supplied.)

Assuming, without deciding, that Bowman had not *promised* to exert his best efforts to sell Burgermeister's beer or to take care of the territory, he had in fact done so for a period of 19 years, had provided a fleet of trucks, painting them with Burgermeister advertising, had contributed to the brewery's advertising fund, had built warehouse facilities and had enlarged his inventory beyond his winter needs, etc. Such a contract is not merely an executory promise for a promise. Professor Williston describes such a contract as "an exclusive option by which the manufacturer promises to deal through no others within the defined territory ... so long as the dealer desires to handle his products. ... If there is sufficient consideration, this option is clearly a contract and is so held." (4 Williston on Contracts (rev. ed.) § 1027a, p. 2850.) There was sufficient consideration given here.

 Nor was this contract, as contended by Burger-meister, within the statute of frauds as being ''An agreement that by its terms is not to be performed within a year from the making thereof.'' (Code Civ. Proc., § 1973, subd. 1; Civ. Code, § 1624, subd. 1.) ''It is well settled that the oral contracts invalidated by the statute because not to be performed within a year include only those which *cannot* be performed within that period.'' (Italics supplied.) (3 Williston on Contracts (3d ed.) § 495, pp. 575-576, citing *Hollywood Motion Picture Equip. Co.* v. *Furer,* 16 Cal.2d 184 [105 P.2d 299].) ''A promise which is not likely to be performed within a year, and which in fact is not performed within a year, is not within the Statute if at the time the contract is made there is a possibility in law and in fact that full performance such as the parties intended may be completed before the expiration of a year.'' (*Op. cit.,* § 495, pp. 576-578, citing *inter alia Warner* v. *Texas & Pac. Ry. Co.,* 164 U.S. 418 [17 S.Ct. 147, 41 L.Ed. 495].)

 The contract we examine is not one which by its terms could not be performed within one year. Had Bowman failed to devote his best efforts or to take care of the territory, the contract would have terminated and this was an event which might have occurred within a year.

In *Mangini* v. *Wolfschmidt, Ltd.,* 192 Cal.App.2d 64 [13 Cal.Rptr. 503], an oral contract employing plaintiff as an exclusive agent to sell defendant's liquor in a designated territory ''as long as plaintiff should continue to use his best efforts to promote and solicit the sale of defendant's products therein'' was upheld against an attack it violated the statute of frauds. The court in that decision stated (on p. 75): ''An express 'as long as performed' contract is not an implied 'reasonable time' contract,'' and quoting from 28 A.L.R.2d 878, the court adds: '' 'Where one enters into a contract to perform personal services for an indefinite period of time, based upon a consideration other than the promise to perform, with the condition or qualification that the employment shall continue as long as he is able to perform or shall satisfactorily perform, the contract is not within the provision of the statute. . . . [T]here is created a contingency by which performance may be terminated within a year.' ''

The brewery's counsel asserts the *Mangini* decision misstates the law. Counsel is mistaken. From the cases cited it is clear he confuses the rules just stated with the rule that the fact that performance by the promisor *may be excused* within

a year does not prevent the application of the statute of frauds. As stated in 3 Williston on Contracts (3d ed.) section 496, p. 589: ". . . It may seem strange that an oral promise to support for thirteen months should be invalid while a promise to support for life is not within the Statute; but this result necessarily follows from the settled construction of the Statute that contracts for performance during an indeterminate period which may be fully completed within a year are not invalidated." (See also *Sessions* v. *Southern Calif. Edison Co.*, 47 Cal.App.2d 611, 617 [118 P.2d 935].)

The contract here was one of indeterminate duration, performance of which could have been completed (not merely excused) within one year.

But, the brewery's counsel argues, even though the trial court's ruling that the contract which this jury found to exist is not within the statute of frauds, it was bound by "the law of the case" here (as stated in *San Francisco Brewing Corp.* v. *Bowman, supra,* 52 Cal.2d 607) to hold that it was. Our reading of the decision on the former appeal does not lead us to the conclusion that it so misstated settled law.

At the first trial Bowman had pleaded both an express and an implied contract. He contended then, as he does now and as the jury here found, that there was an express oral contract with an express provision for its duration, i.e., as long as Bowman exerted his best efforts and "took care of the territory." But in the case as first tried he had also pleaded a second line of support, to wit: a theory of an unexpressed but to-be-implied "reasonable" period of duration to be inferred from the conduct of the parties. The case went to the jury at the first trial on both theories. This court and the Supreme Court (which adopted substantially the opinion of this court written by Justice Van Dyke) held that since the theory of an implied period of "reasonable duration" was before the jury, it should have been instructed by the court: (1) that determination of what was a "reasonable" time was for the jury and moreover, (2) if it found that that period exceeded one year the contract was within the statute of frauds (unless principles of estoppel prevented its operation).

It is true that Justice Van Dyke in reciting the facts of the case, had included the statement, "The agreement was to continue as long as the partners, to use defendant's expression, 'took care of the territory.' " But that statement was preceded by the statement: "Viewing the evidence, as we

must, in support of the verdict.'' In short, the statement of the facts could not and did not *then* assume that there was NO express terminating provision in the contract. It was required to and did make such assumption later, however, when it considered the question of error in the refusal of plaintiff's requested instructions. Emphasizing this the Supreme Court inserted (by addition to Justice Van Dyke's language) the following (on p. 614): "[The jury might properly have found such a contract, *containing no provision for termination*. . . .]'' (Italics supplied.) The only law of the case therefore on the first appeal is the rule (as stated on p. 619): "[I]f the contract did carry within it an implied agreement that it should endure for a reasonable time, and if in fact such reasonable time amounted to a period in excess of the period allowed by the statute, then the contract being wholly oral could not be enforced.''

When the case was retried Bowman placed all eggs in one basket. He abandoned any theory of either an implied contract or of an express contract with no express provision for its termination. He thus gave notice (by amendment to his pleadings) and the jury was notified by proper instructions that Bowman's evidence must prove an express agreement between the parties with an express duration period, otherwise he could not prevail.[3] Under these circumstances no instructions regarding implied contracts, or implied "reasonable" periods of duration of express contracts or the statute of frauds were necessary or relevant.

As stated above, about a month before the brewery's termination of the contract, Bowman had been required to and had employed a sales promotion manager, Clyde Lindstrom. He was employed on an annual basis for $7,200 per year. Evidence produced by Bowman showed he was obligated to pay this sum under Lindstrom's contract, notwithstanding Burgermeister's termination of the distributorship, and he did so. Loss of the distributorship prevented the use of Lindstrom's services for the purpose hired. Instead, he

---

[3]The court instructed the jury as follows: "'As we have already told you, the defendant has abandoned any claim to recover upon implied contract or upon any implied terms of an express contract. If, therefore, you find the existence of an implied contract, or that any of the material terms of the alleged express contract are to be implied from the surrounding circumstances or the conduct of the parties, then your verdict must be for the plaintiff and against the defendant Bowman on his counter-claim and cross-complaint.''

was continued in employment "doing the work of an office girl."

The court instructed the jury to the effect that if it found Bowman was entitled to damages, the difference between Lindstrom's wages paid under a binding contract and the value of any salvageable services performed could be considered as a proper element of special damage. (It was the only item of special damage the jury was permitted to consider.) The giving of this instruction was not error. Of course, the cost of sales promotion and the cost of clerical work is ordinarily a cost of doing business to be deducted from sales proceeds in determining profits. But this is an arithmetical problem in subtraction properly to be performed only when "proceeds of sales" and "cost of doing business" are offsetting and balancing items by which determination of profits is made. Here presumably Lindstrom, had he been permitted to function as a sales promotion manager, would have performed services resulting in increased sales proceeds justifying his salary. What the court allowed the jury to consider was Bowman's forced payment of *wasted* wages. Whether this is properly to be labeled an expense incurred "in reliance upon," or "in preparation for," Bowman's continued performance of the contract which he was unable to perform on account of Burgermeister's breach, it is a foreseeable detriment proximately caused by the breach (Civ. Code, § 3300) and is a proper item of special damages. (14 Cal.Jur.2d, Damages, § 132, pp. 759-760, note 17; 5 Corbin on Contracts, § 1035, p. 177.)

There is no merit to the contention that the trial court instructed the jury that it could allow Bowman $7,200 (one year's salary) as special damage. The jury was properly instructed in this regard as follows: "However, the amount would be subject to deduction for the value of the services rendered by Mr. Lindstrom to Mr. Bowman during the period of employment in his office according to the testimony, and the period would also be limited to the time of the formation of the new corporation. . . ." (As a matter of fact there is nothing in the verdict to indicate the jury allowed Bowman *anything* for this special damage.)

Other contentions are raised by Burgermeister. We deem them to possess insufficient merit to justify extension of this opinion by specific treatment. That which we state above disposes of the appeal.

APPEAL BY BOWMAN ON ALLOWANCE OF INTEREST

 Burgermeister sued for $18,027.14 on an open account for beer sold. The beer was sold, of course, under the distributorship contract. The complaint was filed September 30, 1954. The amount was admittedly due but for Bowman's offsetting claim, also founded upon Burgermeister's breach of the same contract—by premature termination thereof. Under these facts the court allowed Burgermeister an offset of 7 per cent interest on the principal amount from the date the complaint was filed to the date of judgment. The amount was $9,937.48. This allowance was error. It is settled that when a plaintiff sues for a liquidated sum and the defendant establishes an offsetting claim based upon defective workmanship or defective performance of the same contract by the plaintiff, the amount of the former is to be offset against the latter *as of the due date of the original debt* and only the balance bears interest. (*Hansen* v. *Covell*, 218 Cal. 622, 629 [24 P.2d 772, 89 A.L.R. 670].) In the *Hansen* case the rule was applied in a case where "defective workmanship" was the unliquidated breach, and it is held in *Hansen* that "defective workmanship" or "defective performance" of the contract is the distinctive factor in the curtailment (or denial) of interest. It was asserted in *Hansen,* on page 629, that Civil Code section 3287 did not require the assertion of a different rule. The court (on p. 630, referring to the early assertedly "leading" case of *Cox* v. *McLaughlin,* 76 Cal. 60 [18 P. 100, 9 Am. St. Rep. 164]), said, "the rigid test [or nonallowance of unliquidated offsetting claims to reduce interest] was by no means not subject to modification." The rule in *Hansen* was followed in *Union Sugar Co.* v. *Hollister Estate Co.,* 3 Cal.2d 740, 754 [47 P.2d 273], where the unliquidated contract breach was defective growing of a crop. The rule was also followed in *Muller* v. *Barnes,* 139 Cal.App. 2d 847, 850 [294 P.2d 505] (substitution of a horse other than the one contracted to be sold).

 We are unable to distinguish between defective performance and no performance at all. If a plaintiff who renders defective performance is not entitled to receive interest except on the balance after allowance of the offset we can conceive of no sound reason not to apply the same rule when the breach consists of a refusal (by wrongful termination) to perform the plaintiff's obligations under the contract at all. And we so hold. As we see it, if, when the day of reckoning is reached, it has been decided that a

defendant is entitled to an offset, this is a finding that the plaintiff was never entitled to more than the net amount. The defendant was therefore justified in having withheld payment from plaintiff even though the amount of his offset had not been then judicially determined. Palpable inequity attends the assertion of the contrary rule. And, of course, the fact that the offsetting claim exceeds the original claim so that *no* net balance is payable to plaintiff cannot affect the question.

The order denying the judgment notwithstanding the verdict is affirmed. The order denying defendant's and cross-complainant's motion to amend the judgment on verdict of the jury *nunc pro tunc* is affirmed. The judgment is modified, deleting the allowance of interest to Burgermeister for $9,937.48 (thus increasing the net amount of Bowman's judgment by the same amount, with interest thereon from date of judgment). The trial court is directed to enter a modified judgment for Bowman in accordance herewith. Bowman shall recover his costs on appeal.

Schottky, J., and Friedman, J., concurred.

A petition for a rehearing was denied June 12, 1964, and the petition of plaintiff and appellant for a hearing by the Supreme Court was denied July 15, 1964.