[No. C066315. Third Dist. May 24, 2012.]

CALIFORNIA PINES PROPERTY OWNERS ASSOCIATION, Plaintiff and Appellant, v.
ROBERT PEDOTTI, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II through V.

**COUNSEL**

Minasian, Spruance, Meith, Soares & Sexton, Paul R. Minasian and Dustin C. Cooper for Plaintiff and Appellant.

Law Offices of Gifford & Harr and Tom Gifford for Defendant and Respondent.

## Opinion

**MAURO, J.**—California Pines Property Owners Association (the Association) appeals after the trial court resolved a dispute over water diversion rights in favor of defendant Robert Pedotti.

The Association owns land in the community of California Pines in Modoc County, California, including the land where Donovan Reservoir (Reservoir) and its dam are located. Pedotti owns the nearby 1,761-acre Diamond C Ranch (Ranch), where he has raised over 1,000 head of cattle and farmed alfalfa and other natural grasses for livestock.

Pedotti and the Association are assignees of a 1986 50-year water storage agreement (the Agreement) entered into by predecessor owners. Among other things, the Agreement provides: Pedotti has a right to certain water that flows into the Reservoir (Ranch Water)[1] and certain water delivery systems that can divert Ranch Water out of the Reservoir. Pedotti needs the Reservoir to store Ranch Water for Ranch operations. At the same time, the Association needs the Ranch Water to maintain the Reservoir level and the aesthetic value of the waterfront area of the California Pines subdivision. Thus, Pedotti can store Ranch Water in the Reservoir, but he cannot impede the flow of Ranch Water into the Reservoir, and he must use "best efforts" to maintain a full Reservoir, subject to natural circumstances beyond Pedotti's control. The Agreement does not define "best efforts."

The dispute between the parties involves Pedotti's use of Ranch Water in 2006 through 2008. The trial court ruled in Pedotti's favor on each of the Association's causes of action.

On appeal the Association contends (1) "best efforts" means the efforts required of a fiduciary; (2) in interpreting the Agreement, the trial court should have considered extrinsic evidence of the circumstances surrounding the making and the predispute implementation of the Agreement; (3) substantial evidence does not support certain trial court findings; (4) the trial court erred in requiring the Association to prove breach of contract elements on its cause of action for violation of the licenses; and (5) the trial court erred in concluding that Pedotti's water interest had priority over the Association's interest.

---

[1] The source of the Ranch Water is an area known as the Rye Grass Swale.

Addressing the Association's first contention in the published portion of this opinion, we conclude that when a contract does not define the phrase "best efforts," the promisor must use the diligence of a reasonable person under comparable circumstances, not the diligence required of a fiduciary.

In the unpublished portion of this opinion, we address the Association's remaining contentions, concluding the trial court did not err in ruling that the extrinsic evidence proffered by the Association was not relevant; the Association fails to establish that the trial court's findings are not supported by substantial evidence or that any error was prejudicial; any error in requiring the Association to prove breach of contract elements was harmless because the evidence supports the trial court's finding that Pedotti did not violate the licenses; and on the relevant issue as to whether Pedotti breached the Agreement and violated the licenses, the trial court found that he did not, and the evidence supports the trial court's findings.

We will affirm the judgment.

## BACKGROUND

Viewing the evidence in the light most favorable to the prevailing party, giving him the benefit of every reasonable inference and resolving all conflicts in the evidence in support of the judgment (*As You Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 454 [37 Cal.Rptr.3d 399]), we glean the following from the record.

In 1960, the State Water Rights Board, now the State Water Resources Control Board (Board), issued a license for diversion and use of water, license No. 6293. License No. 6293 grants the licensee a right to use Ranch Water from the Rye Grass Swale in an amount not to exceed 565 acre-feet per year for the purpose of irrigation. The license designated a specific geographic area (a "place of use" that is now part of the Ranch) where the water could be put to beneficial use.

In 1972, the Board issued a second license for diversion and use of water, license No. 9869, granting the licensee a right to use Ranch Water from the Rye Grass Swale in an amount not to exceed 669 acre-feet per year, with a maximum withdrawal of 400 acre-feet in any one year, for purposes of irrigation, stockwatering, and recreational uses. Stockwatering is using water for commercial livestock. (Cal. Code Regs., tit. 23, § 669.) Once again, the license designated a specific place of use (now another part of the Ranch that is contiguous with the place of use for license No. 6293) where the water could be put to beneficial use.

To cooperate in the use of the licenses, the Agreement was originally entered into between Leisure Industries, Inc. (Leisure), the predecessor owner of the Reservoir land, and Judith Carlsberg and the estate of Arthur Carlsberg, the former Ranch owners. The Agreement specified that Leisure would allow the Ranch to continue to store Ranch Water in the Reservoir, and the Ranch would not "impede the flow of Ranch Water" into the Reservoir and would "use its best efforts to maintain the water level" of the Reservoir to an elevation of at least 4,353 feet above sea level (the level at which the Reservoir is considered full), "subject to natural disasters, Acts of God, and other physical forces" beyond the control of the Ranch.

In 1992 Leisure assigned its interests in the Agreement to the Association, and in 1993 Pedotti purchased the Ranch and acquired interests in the Agreement and the licenses from the Carlsberg family.

Pedotti has been irrigating with Ranch Water since he purchased the Ranch. Water collected under each license was "commingled" in the Reservoir and flowed out of the Reservoir through the same outlet. Although Pedotti could estimate how much Ranch Water went to each license's place of use, he could not distinguish the water collected under each license when the water was drawn from the Reservoir.

Pedotti used a flood irrigation system (open earthen ditches) to move Ranch Water to irrigate his pastures and fields. To divert water from the Reservoir to the Ranch, Pedotti opened a sliding gate which allowed Ranch Water to flow through a conduit from the Reservoir to a distribution box. From the distribution box, Ranch Water flowed through valves; one valve carried water north and the second valve carried water west. Ranch Water travelled from the valves to the various pastures and fields on the Ranch through six to eight miles of ditches. Because he had a gravity-feed system, Pedotti could not use Ranch Water outside the designated places of use in 2006 through 2008.

Flood irrigation was typical for ranches in Modoc County with "low input sustainable livestock operations," and it was an adequate and appropriate irrigation system for the Ranch. Most flood-irrigated pasture systems in Modoc County used earthen ditches to deliver water to the fields.

Pedotti's expert witness was Dr. Donald Lancaster, who had been the farm adviser and county director for the University of California Cooperative Extension Service in Modoc County for 32 years. As farm adviser, Dr. Lancaster worked with farmers and ranchers on crop and pasture irrigation and management. He published a book on irrigated pasture management in northeastern California, and he also conducted research and published on

the subject of irrigation systems. In addition, he worked with the manager of the Ranch in the 1980's before Pedotti purchased it. Dr. Lancaster was familiar with the Reservoir, observed Pedotti irrigate the Ranch with Ranch Water, and worked with Pedotti on his irrigation and ranch management practices.

The Association's expert witness was Mr. Edward Schmit, a civil engineer who never worked on a flood irrigation or stockwatering system for a ranch in northeastern California. He worked with landowners in northeastern California only once, on a wetlands restoration project near the city of Adin in 1996 and 1997. Although he admitted it would be important for him to see how Pedotti irrigated his fields, Mr. Schmit did not visit the Ranch or observe Pedotti irrigate. Mr. Schmit saw Pedotti's property over a fence and from an airplane in 2009 at a time when Pedotti did not use any Ranch Water.[2]

According to Dr. Lancaster, an enclosed pipe would be the most efficient water delivery system, but such a system was not practical for many flood-irrigated systems. Dr. Lancaster opined that given the system in place at the Ranch and the scope of Pedotti's livestock production, it would not be economically feasible for Pedotti to replace his flood irrigation system with a wheel line or center pivot sprinkler system. It would cost over $200,000 to install a wheel line to irrigate 500 acres. In addition, because of the sediment in the reservoir water, Pedotti would have to filter the water to prevent the nozzles in the sprinklers from clogging up. A pivot system for 500 acres would cost at least $500,000. Such a system would require installing a pump, main line and towers and converting overhead power lines to underground systems. A sprinkler irrigation system was also inappropriate for the Ranch because it requires a reliable source of water and there was insufficient Ranch Water available for such a system.

Pedotti typically began irrigating from the Reservoir on April 1. When he irrigated, he checked the irrigation on a daily basis, sometimes for multiple days. He irrigated if it appeared to him, based on his examination of the soil at the root zone, that further irrigation was needed.

Pedotti irrigated during the winter to ensure that there was water available in the soil in the spring. This practice was common and appropriate because of the unpredictability of winter precipitation and as a hedge against drought conditions.

---

[2] The trial court gave more weight to Dr. Lancaster's expert opinion than the opinion of Mr. Schmit. Because the trier of fact determines the weight to be given expert testimony (*Glover v. Board of Retirement* (1989) 214 Cal.App.3d 1327, 1338 [263 Cal.Rptr. 224]; *Jonte v. Key System* (1949) 89 Cal.App.2d 654, 661 [201 P.2d 562]), we do not reweigh expert opinions on appeal (*Glover v. Board of Retirement, supra*, at p. 1338).

Pedotti maintained his irrigation ditches in 2006 through 2008 by using fall grazing or burning. Allowing cattle to graze in irrigation ditches helped to reduce the amount of vegetation in the water channel so that water could flow more efficiently through the ditches. This was standard practice in Modoc County.

Although it was not best practice to irrigate when cattle are in the field, this was also a common practice in Modoc County. It was not Pedotti's custom and practice to do so, but on occasion he irrigated from the Reservoir while cattle grazed in the lands being irrigated.

Mr. Schmit opined that having livestock in a field during irrigation was not an acceptable practice, because the livestock will compact the soil and make the surface of the field uneven. This causes "ponding" and makes irrigation in the field less efficient in the future. However, the fields at the Ranch were established and well sodded and there was no compaction problem in Pedotti's fields. Compaction of the soil was not a serious problem in Modoc County because the freezing and thawing of the soil in the winter mitigated any compaction of the soil that may have occurred in the summer.

Additionally, Pedotti's fields did not require releveling for the flood irrigation system he used. The field adjacent to the California Pines Community Services District sewer ponds, which Mr. Schmit saw in 2009 and opined needed to be releveled, did not require leveling because it had never been irrigated.

The Association did not have a way to measure the volume of water in the Reservoir, but Pedotti used two methods to measure the volume of Ranch Water he used. He measured the Reservoir's surface elevation level before and after irrigation, and he used various weirs throughout his irrigation system. Pedotti subtracted the amount of water lost through evaporation (typically about 36 inches or 40 percent per season) from the total water loss to arrive at the volume of Ranch Water used.

Surface elevation measurement was an accepted and commonly used method for measuring water usage. Mr. Schmit criticized the use of surface elevation measurement because it failed to account for inflow to the Reservoir, but he admitted he did not know whether there was inflow to the Reservoir in 2006 through 2008.

Water can also be effectively measured using a V-notch weir. A weir can be used at any point in the delivery system. Dr. Lancaster did not recommend the use of a water meter because of the amount of sediment and vegetation in the Reservoir. Very few water meters were used in Modoc County, and meters were used on pump systems, not on surface-delivered irrigation systems.

In 2006 through 2008, Pedotti took less Ranch Water than he was permitted to take under either license. Although the licenses permitted Pedotti to irrigate a total of 512.6 acres on the Ranch, the Reservoir did not hold sufficient water, even when full, to irrigate 500 acres of alfalfa fields and native pastures. Additionally, the water supply from Rye Grass Swale was inconsistent. Pedotti recalled that the Reservoir was full only four times in 16 years. The Association's administrator, Henry Drury, recalled only two years when the Reservoir was full: 1999 and 2006. Consequently, pursuant to a verbal agreement with a neighboring property owner, Pedotti used Canyon Creek to irrigate some of the 512.6 acres of land he was permitted to irrigate under the licenses. Pedotti did not take any water from the Reservoir in 2009 because there was insufficient water in the Reservoir.

Dr. Lancaster opined that Pedotti applied his knowledge and experience to "the management system" and used his maximum efforts to irrigate the Ranch with Ranch Water as beneficially and efficiently as possible. According to Dr. Lancaster, Pedotti was "in the upper echelon of the producers with systems similar to his." Dr. Lancaster testified that Pedotti was "an efficient" and "proficient" irrigator and was very aware of the Ranch's water needs, his water delivery system, and its ability to deliver water to his pastures and fields. Pedotti testified that he irrigated using Ranch Water "[t]o the utmost of" his ability.

As permitted under license No. 9869, Pedotti also took water from the Reservoir for stockwatering purposes. Pedotti stockwatered throughout the year by moving water from the Reservoir to earthen ditches. Mr. Schmit opined that using watering troughs or a pond for stockwatering would be "more efficient in terms of water usage." But according to Pedotti, troughs would not be practical in the fields where he irrigated.

The Association filed a complaint against Pedotti asserting causes of action for (1) breach of contract, (2) violation of reasonable and beneficial use of water, and (3) injunctive relief. The complaint alleged that Pedotti breached the Agreement by failing to use his best efforts to maintain the water level of the Reservoir, taking more water than reasonably permitted under the Agreement, and failing to apply Ranch Water to beneficial use in 2006, 2007 and 2008. The complaint further alleged that Pedotti violated the terms of the licenses by using unreasonable quantities of Ranch Water, applying Ranch Water to lands not specified in the licenses, applying Ranch Water for purposes not listed as permitted beneficial uses under the licenses, and failing to take appropriate measures to conserve water. The Association sought specific performance of the Agreement, the appointment of a water master to regulate the amount of Ranch Water used by the Association and Pedotti, and an order limiting Pedotti's use of the Ranch Water.

Following a court trial, the trial court ruled in favor of Pedotti on each cause of action.

## STANDARD OF REVIEW

A judgment of the trial court is presumed to be correct, and all intendments and presumptions are indulged to support it on matters as to which the record is silent. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) It is the appellant's burden to affirmatively demonstrate reversible error. (*In re Marriage of Gray* (2002) 103 Cal.App.4th 974, 978 [127 Cal.Rptr.2d 271].)

## DISCUSSION

### I

The Association contends the trial court erred by equating best efforts with the implied covenant of good faith and fair dealing and finding that Pedotti satisfied his contractual duty to use best efforts by exercising "good" or "typical" efforts. In the Association's view, the duty to use best efforts is akin to the duty owed by a fiduciary and requires more than usual or reasonably diligent efforts. The Association claims the best efforts provision in the Agreement required Pedotti to place the Association's interest (having a full or mostly full Reservoir) above Pedotti's interest (using Ranch Water for the Ranch). We disagree.

Courts have held that a best efforts clause, without more, does not create a fiduciary relationship. (*Olympia Hotels Corp. v. Johnson Wax Development Corp.* (7th Cir. 1990) 908 F.2d 1363, 1374; *O'Hearn v. Bodyonics, Ltd.* (E.D.N.Y. 1998) 22 F.Supp.2d 7, 12 ["Under New York law, an arms-length commercial transaction generally does not give rise to a fiduciary relationship, even if the defendants have relied on the plaintiffs' contractual obligation to use their 'best efforts' . . . ."]; *Ekern v. Sew/Fit Co., Inc.* (N.D.Ill. 1985) 622 F.Supp. 367, 372–373 [finding no fiduciary relationship between the parties even where they had a best efforts contract]; see 2 Farnsworth on Contracts (3d ed. 2004) § 7.17c, p. 405 [best efforts "presumably falls short of the standard required of a fiduciary, who is required 'to act primarily for the benefit of another in matters connected with his undertaking' "].)

California courts have enforced best efforts contracts but have not defined the term "best efforts." (*Gilmore v. Hoffman* (1954) 123 Cal.App.2d 313, 319–320 [266 P.2d 833] (*Gilmore*); *Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264, 274 [68 Cal.Rptr.3d 499] (*Midland Pacific*).)

Instead, best efforts are construed in the context of the circumstances in a particular case. (*Gilmore, supra*, at p. 320 [whether the defendant exercised best efforts under the circumstances was a factual question to be decided by the trier of fact]; accord, *Triple-A Baseball Club v. Northeastern Baseball* (1st Cir. 1987) 832 F.2d 214, 225 [best efforts "cannot be defined in terms of a fixed formula . . . [but] varies with the facts and the field of law involved"]; *Bloor v. Falstaff Brewing Corp.* (S.D.N.Y. 1978) 454 F.Supp. 258, 266, affd. (2d Cir. 1979) 601 F.2d 609.) Additionally, a best efforts clause must be reconciled with other clauses in the contract to the extent possible. (Civ. Code, § 1641; accord, *Vestron, Inc. v. National Geographic Society* (S.D.N.Y. 1990) 750 F.Supp. 586, 593.)

*Gilmore, supra*, 123 Cal.App.2d 313 illustrates the fact-intensive inquiry required in determining whether best efforts were exercised. The issue in *Gilmore* was whether the defendants fulfilled their best efforts obligation to supply water to the plaintiff's farm. (*Gilmore, supra*, 123 Cal.App.2d at p. 319.) The parties' lease agreement required the defendants to provide the plaintiff with sufficient water for irrigation. (*Id.* at pp. 314–315.) The defendants agreed that in the event the supply of water materially decreased or the pumping plant on the leased property failed, the defendants would deepen the well, lower the pump or " 'do such other things as may be necessary to increase the supply of water that can be produced by the said well and pumping plant to an amount as nearly equal to that now being produced as is reasonably possible.' " (*Id.* at p. 315.) The lease agreement stated, " 'nothing herein contained to be construed as making the lessors guarantors of water at all times, but only to use their best efforts to see that there is sufficient water to irrigate said property.' " (*Ibid.*)

When one of the pumping plants furnishing water to the leased property failed, the defendants made some effort to repair the pump on three occasions. (*Gilmore, supra*, 123 Cal.App.2d at pp. 317–318.) However, the plaintiff was unable to irrigate his crop for about one and a half months. (*Id.* at p. 315.) After three attempts to repair the pump, the defendants drilled a new well. (*Id.* at p. 318.) In the meantime, the plaintiff's crop did not survive. (*Ibid.*)

The trial court found that the defendants' failure to "do such other things as might be necessary" to supply water to the plaintiff showed a lack of diligence resulting in the plaintiff's damages. (*Gilmore, supra*, 123 Cal.App.2d at p. 316.) The appellate court affirmed the trial court's judgment. (*Id.* at p. 324.) On appeal, the defendants in that case argued that they exercised reasonable diligence in repairing the pump and if best efforts required them to drill a new well, they did so diligently. (*Id.* at pp. 316–317.) The plaintiff responded that the defendants failed to exercise ordinary diligence in ensuring

that there was sufficient water to irrigate the leased property. (*Id.* at p. 317.) The appellate court held that the defendants could not satisfy their obligation to use their best efforts to see that there was sufficient water to irrigate the leased property by making only two or three unsuccessful attempts to repair the pump. (*Id.* at p. 319.) Based on the trial court's factual findings, the appellate court concluded that best efforts required the defendants to drill a new well when they were notified that the pump had stopped working. (*Ibid.*) The appellate court did not define "best efforts." Rather, it stated, "[w]hether defendants took the proper course, obtained proper counsel and advice, and acted wisely and timely and used their best efforts under the circumstances to correct the condition was a factual question for the trial court to determine. Its finding on this question, under the evidence, cannot be disturbed on appeal." (*Id.* at p. 320.)

■ Courts from other jurisdictions have held that when a contract does not define the phrase "best efforts," the promisor must use the diligence of a reasonable person under comparable circumstances. (*Coady Corp. v. Toyota Motor Distributors, Inc.* (1st Cir. 2004) 361 F.3d 50, 59 [" 'Best efforts' is implicitly qualified by a reasonableness test—it cannot mean everything possible under the sun . . . ."]; *Hoffman v. L & M Arts* (N.D.Tex. 2011) 774 F.Supp.2d 826, 834 [best efforts holds defendants to an objective standard based on norms of reasonableness in the industry]; *Bloor v. Falstaff Brewing Corp., supra,* 454 F.Supp. at pp. 267, 269, 271–272 [finding that promisor breached its best efforts contract by failing to act in the manner required for an "average, prudent, comparable brewer" situated as promisor]; *Arnold Productions, Inc. v. Favorite Films Corp.* (S.D.N.Y. 1959) 176 F.Supp. 862, 866–867, affd. (2d Cir. 1962) 298 F.2d 540 ["In ascertaining best efforts we would have to compare defendant's performance with the average, prudent comparable distributor in the T.V. market. A comparison of defendant's performance with that of the comparatively small scale operations of plaintiff's expert would not be valid."]; *CKB & Associates, Inc. v. Moore McCormack Petroleum, Inc.* (Tex.App. 1991) 809 S.W.2d 577, 582 [when a party misses the goals or guidelines set forth in a best efforts contract, courts measure the quality of its efforts by the circumstances of the case and by comparing the party's performance with that of an average, prudent, comparable operator].) We agree with these authorities.

■ Best efforts does not mean every conceivable effort. (*Triple-A Baseball Club v. Northeastern Baseball, supra,* 832 F.2d at p. 228.) It does not require the promisor to ignore its own interests, spend itself into bankruptcy, or incur substantial losses to perform its contractual obligations. (*Bloor v. Falstaff Brewing Corp., supra,* 601 F.2d at pp. 613–614.) Rather, it " 'requires a party to make such efforts as are reasonable in . . . light of that party's ability and

the means at its disposal and of the other party's justifiable expectations. . . .' " (*Samica Enterprises v. Mail Boxes Etc. USA, Inc.* (C.D.Cal. 2008) 637 F.Supp.2d 712, 717.)

■ Thus, while we agree with the Association that a promise to use "best" efforts is different than a promise to act in "good faith" (2 Farnsworth on Contracts, *supra*, § 7.17c, p. 405),[3] we do not agree that a promise to use best efforts creates an obligation equivalent to a fiduciary duty. Instead, we agree with the courts from other jurisdictions that when a contract does not define the phrase "best efforts," the promisor must use the diligence of a reasonable person under comparable circumstances. Diligence is certainly required, but the obligation is framed within the bounds of reasonableness.

■ In this case, the trial court stated that the best efforts clause did not create a fiduciary relationship and had to be examined in the context of the Agreement and what constituted best practices for a rancher in Modoc County using his water rights licenses for the stated purposes. The trial court did not apply an erroneous standard.

Nonetheless, the Association asserts that the courts in *Brogdex Co. v. Walcott* (1954) 123 Cal.App.2d 575 [267 P.2d 28] (*Brogdex*), *Larkin v. Williams, Woolley, Cogswell, Nakazawa & Russell* (1999) 76 Cal.App.4th 227 [90 Cal.Rptr.2d 195] (*Larkin*), *Credit Bureau Metro, Inc. v. Mims* (1975) 45 Cal.App.3d Supp. 12 [119 Cal.Rptr. 622] (*Mims*), *In re Marriage of Hublou* (1991) 231 Cal.App.3d 956 [282 Cal.Rptr. 695], *Burgermeister Brewing Corp. v. Bowman* (1964) 227 Cal.App.2d 274 [38 Cal.Rptr. 597] (*Bowman*), *Cooper v. American Fruit Growers, Inc.* (1934) 137 Cal.App. 494 [30 P.2d 558] (*Cooper*), and *Midland Pacific, supra*, 157 Cal.App.4th 264 enforced best efforts contracts and concluded that best efforts required more than reasonably diligent efforts. We disagree.

*Brogdex* did not involve a breach of contract claim. (*Brogdex, supra*, 123 Cal.App.2d at p. 576.) Instead, the appellate court in *Brogdex* found that the defendants breached the implied obligation to deal fairly and in good faith. (*Id.* at p. 581.) The court did not find a breach of the best efforts clause in the parties' agreement.

---

[3] Farnsworth distinguishes the standard of best efforts from that of good faith: "Good faith is a standard that has honesty and fairness at its core and that is imposed on every party to a contract. Best efforts is a standard that has diligence as its essence and is imposed on those contracting parties that have undertaken such performance. The two standards are distinct and . . . best efforts is the more exacting . . . ." (2 Farnsworth on Contracts, *supra*, § 7.17c, p. 405, fn. omitted.)

The meaning of the best efforts provision in *Bowman* was not an issue presented to the appellate court or discussed by it. (*Bowman, supra,* 227 Cal.App.2d at pp. 277–278.) *Larkin* involved a petition to compel arbitration. The appellate court did not discuss the merits of the plaintiff's breach of contract claim. (*Larkin, supra,* 76 Cal.App.4th at pp. 229–230.) *Mims* did not involve a best efforts contract. The issue in *Mims* was whether the plaintiff complied with the requirement to act "in good faith and in a commercially reasonable manner" pursuant to California Uniform Commercial Code former section 9504. (*Mims, supra,* 45 Cal.App.3d at pp. Supp. 14–15.)

*In re Marriage of Hublou* involved a trial court finding that the respondent did not use her best efforts to obtain employment as contemplated by a dissolution judgment. (*In re Marriage of Hublou, supra,* 231 Cal.App.3d at p. 960.) The sole issue on appeal was whether the trial court abused its discretion in awarding attorney's fees and costs to the respondent. (*In re Marriage of Hublou, supra,* 231 Cal.App.3d at p. 958.) The appellate court did not construe the best efforts provision in the dissolution judgment or determine whether the respondent had complied with the requirement in the judgment to use best efforts.

The promisor in *Cooper* neglected to take any action to perform its contractual obligation. (*Cooper, supra,* 137 Cal.App. at p. 495.) This court did not discuss the quality of the promisor's performance (good, typical, reasonably diligent, or otherwise) because the promisor simply did not undertake any effort to perform. And the court in *Midland Pacific, supra,* 157 Cal.App.4th 264 did not state that best efforts required more than reasonably diligent efforts. (*Midland Pacific, supra,* 157 Cal.App.4th at pp. 274–275.)

Accordingly, the Association's contention lacks merit.

II–V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 384.

## DISPOSITION

The judgment is affirmed.

Hull, Acting P. J., and Robie, J., concurred.