**ALPHA DISTRIBUTING COMPANY OF CALIFORNIA, INC.,** also doing business under the name and style of Alpha Distributing Company, Inc., Plaintiff, Appellee, Cross-Appellant,

v.

**JACK DANIEL DISTILLERY, LEM MOTLOW, PROP., INC.,** a corporation, Brown-Forman Distillers Corporation, a corporation, Defendants, Appellants, Cross-Appellees.

Nos. 24541, 24542 and 24561.

United States Court of Appeals, Ninth Circuit.

Jan. 6, 1972.

Rehearing Denied Feb. 9, 1972.

A. B. Dunne (argued), Louis L. Phelps, of Dunne, Phelps & Mills, San Francisco, Cal., for Jack Daniel Distillery and others.

J. Albert Hutchinson (argued), San Francisco, Cal., for Alpha Distributing Co. of Cal., Inc.

Before MADDEN, Judge of the United States Court of Claims,* and HAMLEY and TRASK, Circuit Judges.

* The Honorable J. Warren Madden, Senior Judge of the United States Court of Claims, sitting by designation.

HAMLEY, Circuit Judge:

Alpha Distributing Company of California, Inc. (Alpha),[1] brought this action against Jack Daniel Distillery, Lem Motlow, Prop., Inc. (Jack Daniel), Brown-Forman Distillers Corporation (Brown-Forman), and others,[2] for damages, and for injunctive and declaratory relief, because of Jack Daniel's termination of Alpha's whiskey distributorship. Alpha commenced the action in the Superior Court of the State of California in and for the City and County of San Francisco. Jack Daniel removed the case to the United States District Court because of diversity of citizenship.

In its complaint Alpha made three claims against defendants, namely that in terminating the distributorship, defendants: (1) breached an oral distributorship contract, (2) violated California antitrust statutes, and (3) interfered with contractual rights and business relations between Alpha and Jack Daniel. After Jack Daniel removed the case to the federal court, Alpha filed a supplement to its complaint alleging, as a fourth claim, that defendants had violated federal antitrust statutes. Alpha sought damages in the sum of $2,125,000 on each claim (but not cumulative), a trebling of the damages assessed, and reasonable attorneys' fees.

Jack Daniel and Brown-Forman answered, denying the critical allegations of the complaint and supplement thereto. Jack Daniel also counterclaimed for $36,-885.00, for whiskey sold and delivered to Alpha and not paid for. The counterclaim was not contested.

At the conclusion of a lengthy non-jury trial, the district court determined that Jack Daniel was liable to Alpha for damages for breach of contract. It determined all other claims in favor of defendants. These determinations are evidenced by a memorandum of decision, findings of fact and conclusions of law on the issue of liability.

The court reserved the issue of damages on the first claim and appointed a special master to report thereon. In due course the special master filed a report and account, recommending that Alpha be awarded damages in the sum of two hundred and five thousand dollars on its first claim.

Proceedings were had thereon, the result being that the district court accepted the special master's recommendation, deducted therefrom the amount of Jack Daniel's uncontested counterclaim, and awarded Alpha judgment in the sum of $168,115 against Jack Daniel on its first claim. The judgment recites that in its memorandum of decision, findings of fact and conclusions of law, previously filed, defendants were awarded judgment on the second, third and fourth claims. However, the decretal provisions of the judgment make no reference to those claims.

Jack Daniel appeals from the judgment against it on the first claim and, on the remaining three claims, insofar as the judgment expressly fails to award judgment for it on those claims.[3] Brown-Forman appeals from the judgment insofar as the decretal provision thereof fails expressly to award judgment in its favor and against Alpha on all four claims. Alpha cross-appeals from the judgment insofar as it awards judgment for defendants on the second, third and fourth claims. An earlier stage of this controversy was before this court in 304 F.2d 451 (9th Cir. 1962).

---

1. "Alpha" as used herein, includes plaintiff's predecessor.

2. Only defendants Jack Daniel and Brown-Forman were served and appeared at the trial. They will sometimes be referred to herein as "defendants."

3. Jack Daniel's notice of appeal also recites that the judgment is appealed from insofar as it "fails to award to this defendant affirmative relief against plaintiff on defendant's counterclaim. . . ." Presumably this recital was intended only to preserve Jack Daniel's position that it is entitled to an affirmative award in the event it prevails on its challenge to the damage award to Alpha on the first claim.

We reverse the judgment insofar as it awards recovery to Alpha on the first claim. We affirm the judgment insofar as it denies recovery to Alpha on the third claim. The cause will be remanded for supplemental findings and conclusions on the second and fourth claims, and for entry of an amended judgment in favor of defendants on the first and third claims. The judgment on remand should also reflect an award in favor of Jack Daniel in the sum of $36,885.00 upon its uncontested counterclaim.

The background facts stated below are drawn largely from the district court's memorandum of decision and findings of fact.

In 1950 Jack Daniel was a small Tennessee distillery owned and operated by the Motlow family, making a high-grade sour or bourbon mash leached (charcoal filtered) whiskey. Alpha was a licensed wholesale distributor and importer of alcoholic beverages in the state of California. Alpha, a California corporation, maintained its principal office at San Francisco, and sales offices in other places in the northerly part of the state. Brown-Forman is a Delaware corporation engaged in the manufacture of distilled spirits in the state of Kentucky, which products were sold in interstate commerce and in the state of Kentucky.

On or about August 4, 1950, D. E. Motlow, acting for Jack Daniel, became acquainted with Loris M. diGrazia, president of Alpha. Jack Daniel's products were then virtually unknown to the trade in California and were in limited supply; but an additional supply of aged Jack Daniel whiskeys was anticipated in 1951 and thereafter.[4]

At their August 4, 1950 meeting Motlow and diGrazia discussed a proposal that Alpha become the exclusive distributor for Jack Daniel products in Northern California, and basic understandings

concerning such an exclusive distributorship were expressed. These understandings were confirmed in subsequent telephone conversations and correspondence. During October, 1950, Alpha placed its first order, and was supplied with some three hundred cases of Jack Daniel's Black Label whiskey during 1950.

Alpha immediately commenced to "pioneer" the distribution of Jack Daniel products in an "excellent manner. It supplied local advertising, sales aids, sampling and other promotional and sales activities and support. During 1954 Alpha assigned a sales executive as "brand manager" of Jack Daniel's whiskeys, a function customarily carried out by distillers in aid of their distributors. In the early period of Alpha's distributorship, Jack Daniel did not provide any local advertising or promotion for its products.

In mid-1951, Jack Daniel appointed Parrott & Co., a California corporation (Parrott), as its broker in eleven of the western states of the United States. Alpha's purchases and sales of Jack Daniel's products progressively increased, from two thousand seven hundred cases in 1951 to ten thousand four hundred and nine cases in 1955. During 1954, Jack Daniel curtailed its distillation of whiskey, closing its operations for several months. This resulted in lesser quantities of aged whiskeys maturing in 1958 and 1959.

In early 1956, Jack Daniel advised Alpha that a shortage of its products in relation to sales was anticipated. Because of this, Jack Daniel advised, sales to Alpha and other purchasers would be rationed or allocated to Jack Daniel's existing customers on an equitable basis as related to 1955 purchases. Jack Daniel requested Alpha to similarly allocate its supplies to Alpha's existing customers for Jack Daniel products. Such alloca-

---

4. The trial court found that Jack Daniel was the only "legal distillery in Tennessee," its products were unique, irreplaceable and constituted the only Tennessee whiskeys then made for lawful sale. This whiskey was designated as a sepa- rate category of whiskey under regulations promulgated under the Federal Alcohol Administration Act, 27 U.S.C. § 201, et seq. See also, Jack Daniel Distillery, Inc. v. Hoffman Distilling Co., 190 F.Supp. 841, 843 (W.D.Ky.1960).

tion to Alpha by Jack Daniel and by Alpha to its established customers continued until the distributorship was terminated, as described below.

On August 25, 1956, Brown-Forman formed a new corporation under the Jack Daniel name, which corporation acquired the old Jack Daniel corporation four days later. The old corporation was thereupon liquidated. Brown-Forman held all of the capital stock of the new Jack Daniel.

The original oral distributorship contract was amended in certain respects, the most recent as of October 27, 1958. These amendments pertained to (1) the expansion and contraction of Alpha's exclusive territory, and (2) Jack Daniel's allocation scheme. There were no amendments with regard to the duration or manner of terminating the contract.

On October 31, 1960, Jack Daniel gave Alpha written notice that the distributorship would be terminated effective December 31, 1960. No cause was stated for this termination. On December 31, 1960, Alpha had in excess of three thousand five hundred customers in its exclusive territory for Jack Daniel whiskey.

Upon its refusal to further deal with Alpha, Jack Daniel furnished its products to Rathjen Bros. of California and Rathjen Bros. of Oakland (Rathjen) which had been Brown-Forman's distributor. Rathjen had been a competitor of Alpha in the distribution of distilled spirits at wholesale in Alpha's exclusive Jack Daniel territory. Rathjen assumed and continued Alpha's system of allocation of Jack Daniel products to Alpha's established customers, as requested by Jack Daniel, and as aided by Parrott as Jack Daniel's broker-agent.

As a basis for its breach of contract claim against Jack Daniel, Alpha alleged in its complaint that, by the terms of the oral contract for an exclusive distributor-

ship of Jack Daniel's products in Northern California, the parties agreed that Alpha should remain and continue as Jack Daniel's exclusive distributor as long as Alpha performed its undertakings thereunder. According to Alpha, it was understood that Alpha's exclusive distributorship should not and would not be terminated without good cause.

The trial court determined that these allegations had been proved. The court specifically found that under the oral contract, the distributorship was not to be terminated, except for cause.[5] The court further found that Jack Daniel terminated the distributorship without cause, this constituting a material breach of the contract. The court also found that, after December 31, 1960, Alpha desired, intended and attempted to carry out its undertakings under the contract. On the basis of these findings, the trial court concluded that Jack Daniel wrongfully breached and repudiated the described contract without cause or justification, to Alpha's injury and damage.

Jack Daniel argues on its appeal that the trial court's determination that the oral distributorship contract was terminable only for cause is either an incorrect legal conclusion or a clearly erroneous finding of fact. Alpha, in response, contends that the determination is supported by the record.

However, in its brief in this court, Alpha itself concedes that the original oral understanding was that there was to be a continuing business, but that there was no time limit or expressly agreed-upon means of terminating the arrangement. Under the evidence, as Alpha concedes, there was not "any discussion of termination," but only that "we would do business and hoped that we would grow."

An appendix to Alpha's brief sets forth abstracts of testimony of the witnesses who participated in negotiating the distributorship agreement. The tes-

---

5. The trial court also found that, under the contract, Alpha had a continuing option to require Jack Daniel to continue to deal with Alpha so long as Alpha desired to purchase Jack Daniel's products for resale and performed its undertakings under the contract and so long as the purposes of the contract could be lawfully carried out.

timony there reviewed indicates that the distributorship was to be exclusive, but there was no testimony that the duration of the contract or a method of termination was expressly agreed upon. Loris diGrazia, president of Alpha, was not even asked about the duration or manner of terminating the contract. D. E. Motlow, who represented Jack Daniel, testified that "nothing was said about any duration of time." Motlow further testified that there "was the idea of it being a continuing business," but added that nothing was said about a time limit or means of terminating the arrangement.

■ Our review of the record also convinces us that the parties to the contract did not expressly agree that the contract was to be terminable only for cause. We have found no indication of any such agreement. It follows that the trial court's determination, insofar as it is intended to be a finding of fact that Jack Daniel and Alpha expressly agreed that the distributorship would be terminable only for cause, is clearly erroneous.

But Alpha argues, in effect, that where a distributorship for a particular area is exclusive, and there is no specific agreement to the contrary, the distributorship is, as a matter of law, terminable only for cause. The trial court did not articulate such a reason for its determination. Nevertheless, we have examined the cases and texts relied upon by Alpha for this proposition and conclude that it is not supported by substantial authority.

In making this argument, Alpha places principal reliance upon Burgermeister Brewing Corporation v. Bowman, 227 Cal.App.2d 274, 38 Cal.Rptr. 597 (1964). It is true that *Burgermeister* involved an exclusive distributorship and that the court held that the arrangement was terminable only for cause. But the court did so on the basis of a determination that there was substantial evidence supporting the jury's implied finding that there existed between the parties an oral contract creating a beer distributorship "for an expressly agreed-upon term, to-wit: as long as Bowman should continue

to use his best efforts to promote and solicit the sale of the brewery's products and 'took care of the territory;' . . .'" (227 Cal.App.2d at 277; 38 Cal.Rptr. at 599). The court quoted specific testimony to the effect that there was an express understanding of this kind.

The rule of *Burgermeister*, then, is that where parties expressly agree that the exclusive distributorship shall continue while the distributor exercises his best efforts, the contract is terminable only for cause. *See also* Mangini v. Wolfschmidt, Ltd., 192 Cal.App.2d 64, 13 Cal. Rptr. 503 (1961). Neither the cases cited above, nor any of the other authorities cited by Alpha, stand for the broad proposition that, absent evidence of agreement to the contrary, an exclusive distributorship is terminable only for cause.

The true California rule, where a contract for an exclusive distributorship fails to fix a definite term of duration, was most recently announced in International Aerial Tramway Corp. v. Konrad Doppelmayr & Sohn, 70 Cal.2d 400, 74 Cal.Rptr. 908, 450 P.2d 284 (1969). That case involved a contract granting the exclusive sales rights on most of the North American continent for Doppelmayr ski lifts. By way of announcing the rule to be applied, the California Supreme Court quoted (at 450 P.2d 288) from its opinion in Consolidated Theatres, Inc. v. Theatrical Stage Employees Union, Local 16, 69 Cal.2d 713, 73 Cal. Rptr. 213, 447 P.2d 325 (1968), saying:

"We pointed out [in *Consolidated Theatres*] that 'While the initial effort of the courts, in construing contracts of continuing performance or forbearance which contain no express term of duration, must always be that of implying a term of duration commensurate with the intentions of the parties, in some cases the nature of the contract and the totality of surrounding circumstances give no suggestion as to any ascertainable term. In such cases the law usually implies that the term of duration shall be at least a reasonable time, and that the obligations un-

der the contract shall be terminable at will by any party *upon reasonable notice* after such a reasonable time has elapsed. (Citations.) *This rule is generally applicable, for instance, to exclusive sales agency and distributorship contracts.'* (Italics added; footnotes omitted.) (69 A.C. at pp. 756–757, 73 Cal.Rptr. at p. 223, 447 P.2d at p. 335.)"

In the present case, as we have indicated above, the evidence does not suggest that the contract between Alpha and Jack Daniel had any ascertainable term of duration. We have decided that the trial court's findings as to duration were clearly erroneous. It follows that, under the rule quoted above, the law implies that the duration of the distributorship shall be at least a reasonable time, and that the obligations under the contract shall be terminable at will by any party upon reasonable notice after such reasonable time has elapsed.

Alpha's distributorship for Jack Daniel lasted for more than ten years, from August 4, 1950 to October 31, 1960, when notice of termination was given. That appears to us to be a reasonable duration of this distributorship and the trial court did not find to the contrary. Jack Daniel then gave three months' notice that the distributorship would be terminated on December 31, 1960. That also appears to us to be reasonable notice and, again, the trial court did not hold to the contrary.

We conclude that, under the applicable California rule, Jack Daniel terminated the oral exclusive distributorship at a time and in a manner which did not constitute a breach of the oral contract. The trial court therefore erred in holding Jack Daniel liable on the breach of contract claim. It is unneces-

sary for us to consider Jack Daniel's statute of frauds defense on this claim, or any of the issues pertaining to the amount of damages for breach of contract.

We turn now to Alpha's cross-appeal from the district court judgment insofar as that judgment denied Alpha relief on its second, third and fourth claims.

In its third claim, Alpha alleged that, on or about October 31, 1960, defendants individually and in concert with others, and without cause, justification, excuse or privilege, wrongfully interfered and ever since have continued to interfere with the contracts and business relationships existing between Jack Daniel and Alpha. Alpha further alleged that defendants wrongfully induced and persuaded Jack Daniel to repudiate and breach its contract with Alpha and to refuse and refrain from further performance of its undertakings to Alpha thereunder.

Jack Daniel and Brown-Forman answered with general denials and other defenses. The trial court, upon the basis of its general findings of fact, concluded that defendants are entitled to judgment on this claim. On appeal Alpha urges that the denial of relief upon its third claim "constituted clear error on the face of the record and uncontradicted evidence."

Tortious interference with business relations is actionable in California. The governing principle has often been stated in terms of inducing breach of contract.[6] However, a more precise statement of the principle makes it clear that an action may lie even though no actual breach of contract was induced. Thus, in Herron v. State Farm Mutual Ins. Co., 56 Cal.2d 202, 14 Cal.

6. For example, in Imperial Ice Co. v. Rossier, 18 Cal.2d 33, 112 P.2d 631, 632 (1941), the court said:
"It is universally recognized that an action will lie for inducing breach of contract by a resort to means in themselves unlawful such as libel, slander, fraud, physical violence, or threats of such action. . . . Most jurisdictions also hold that an action will lie for inducing a breach of contract by the use of moral, social, or economic pressures, in themselves lawful, unless there is sufficient justification for such inducement."

Rptr. 294, 363 P.2d 310, 312 (1961), the court announced this rule:

> "An action will lie for the intentional interference by a third person with a contractual relationship either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification." [7]

■■ Under this broader statement of the principle, interference with contractual relations of others may be tortious even though the contract is terminable at will. Speegle v. Board of Fire Underwriters, 29 Cal.2d 34, 172 P.2d 867, 870 (1946). Thus the fact that Alpha's distributorship with Jack Daniel was terminable at will, does not preclude Alpha from recovery on its third claim.[8]

It is unquestionably true that Brown-Forman acted to bring about the switch of the Jack Daniel distributorship from Alpha to Rathjen. But Alpha does not point to any circumstance indicating that such action was in itself unlawful, because of libel, slander, fraud, physical violence or threats of such action, to employ the formulation of the rule set out in the *Imperial Ice Co.* case, quoted in note 6.

Nor does the record show that, apart from possible antitrust implications, Brown-Forman lacked justification for its action. That company is the sole stockholder of Jack Daniel. In the *Chicago Title Insurance Co.* case cited in note 8, the court made it clear that one with a financial interest in the business of another is privileged so long as he does not employ improper means "but acts merely to protect his financial interest or promote the other's welfare.

. . . " 444 P.2d at 490. This view was announced with regard to a claim of tortious interference with prospective business advantage rather than tortious interference with an existing contractual relationship, but we think it is also applicable in the latter circumstance.

Apart from the position of Brown-Forman, Alpha, in its brief, states:

> "The conspiracy of Wirtz, Consolidated, Rathjen, Brown, . . . Parrott & Co. and Jack Daniel (see testimony and correspondence cited and quoted in Part One of this filing, supra, and hereinafter) to induce the breach of Alpha's contract is explicit, uncontradicted and not open to reasonable conflicting inferences and defendants proffered no evidence in contradiction."

■ To the extent that we have succeeded in finding the testimony thus referred to in Alpha's blanket reference quoted above, we conclude that the evidence does not establish a claim against Jack Daniel for tortious business interference. Apart from antitrust considerations, to be explored below, Jack Daniel had a legitimate business interest in terminating the distributorship with Alpha. It had the right to terminate that arrangement at will, and without cause, after the lapse of a reasonable time, free of liability. The fact that it utilized the assistance of others in formulating the business judgment to exercise this right did not, apart from possible antitrust implications, make Jack Daniel liable for exercising that right. We need not consider whether those (other than Brown-Forman) who assisted Jack Daniel in

---

7. With reference to the affirmative defense of justification, the *Herron* court said:
"Whether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the actor's conduct and the relationship between the parties." 363 P.2d, at 312.

8. It is true that, since *Herron, supra,* the courts of California have sometimes returned to the earlier statement phrased in terms of breach of contract. *See,* e. g., Chicago Title Ins. Co. v. Great Western Financial Corporation, 69 Cal. 2d 305, 70 Cal.Rptr. 849, 444 P.2d 481, 490 (1968). But it is probable that, in these instances, the court used "breached" as a synonym for "terminated."

making this decision are liable, for those others are not defendants in this action. *See* note 2. In our opinion the trial court did not err in awarding judgment for both defendants on Alpha's third claim.

Alpha's cross-appeal also challenges the judgment for defendants on the state and federal antitrust issues embraced in Alpha's second and fourth claims.

In its second claim, pertaining to California antitrust statutes,[9] Alpha alleged that Brown-Forman and Jack Daniel had unlawfully conspired and agreed together, and with others. These others, according to Alpha, included Rathjen, Consolidated Enterprises, Inc., Parrott & Company, all corporations, and the following individuals: Robinson S. Brown, Jr., Winton E. Smith, Robert Harbour, Arthur M. Wirtz, Robert L. Minkler and John Gallagher. The purposes of this conspiracy and agreement, Alpha asserted, were to:

1. carry out restrictions in trade and prevent competition in the sale of merchandise, to-wit: distilled spirits, in sections of Northern California (such as Schenley products);

2. wrongfully exclude Alpha from the purchase and resale to licensed retailers of distilled spirits, particularly Jack Daniel whiskeys; and

3. wrongfully create, maintain and enforce a monopoly in sections of Northern California in respect to Tennessee whiskeys.

In its fourth claim, pertaining to federal antitrust statutes,[10] Alpha reasserted the factual basis for its second claim.

Alpha asserts that, in this fourth claim, it alleged as an additional ground, the allegation that, in the acquisition of the assets of Jack Daniel by Brown-Forman, defendants restricted trade and commerce in distilled spirits in a portion of the United States, particularly in:

1. the elimination of competition therein by removing from competition Jack Daniel as a competitor of Brown-Forman in the business of manufacturing and selling distilled spirits;

2. the elimination of an independent source of supply of Tennessee whiskeys available to Alpha; and

3. the termination of such supply to Alpha on December 31, 1960, in violation of section 7 of the Clayton Act, 15 U.S.C. § 18.

Jack Daniel, however, denies that any such additional ground was added to the issues in the case. We find no such claim asserted in either the initial complaint or the supplement thereto, and there was no pretrial order defining the issues. Nor do we find facts alleged in the pleadings which would give rise to an unarticulated claim of this kind. The memorandum opinion of the trial court makes no reference to such an issue. In Alpha's answering brief Alpha quotes what purports to be its restatement of its claims for "purposes of trial," but it provides no record reference as to where this quoted statement may be found, and we have been unable to find it.[11] We conclude that there is, in this case, no issue pertaining to a violation of section 7 of the Clayton Act, 15 U.S.C. § 18, because of Brown-Forman's acquisition of Jack Daniel.

9. Particularly sections 16720–16758, Cal. Business and Professional Code, provisions of the Cartwright Act.

10. Particularly sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

11. In its reply brief on the cross-appeal, Alpha provides two references as to where facts concerning this asserted merger claim may be found in the record. One of these references pertains to wholly different matters. The other pertains to allegations in the complaint pertaining to acquisitions by Brown-Forman, which allegations were later stricken from the complaint on Alpha's motion to amend. Alpha also gives a record reference to a quotation, in the memorandum opinion, of portions of the complaint pertaining to Brown-Forman acquisitions. But this quotation by the trial court records only the fact that these allegations were stricken from the complaint on Alpha's motion.

Jack Daniel and Brown-Forman answered with general denials and other defenses with regard to the federal and state antitrust claims. The trial court, upon the basis of its general findings of fact, concluded that defendants are entitled to judgment on these (second and fourth) claims.

The substance of Alpha's antitrust position, insofar as it has possible merit, is that defendants combining and conspiring with each other, and others, and with a purpose to hamper competition by Schenley products by switching the Jack Daniel distributorship from Alpha to Rathjen, damaged Alpha in its business and property by causing the destruction of:

1. its contract rights;

2. its right to purchase its requirements of Jack Daniel's products in the usual course (with, or without, a contract); and

3. its good will (a) as related to the general subject matter and (b) as related to its allocated customers— "both of the latter as appropriated to defendants and Rathjen."

To a substantial extent, Alpha's antitrust claims are thus essentially a reassertion of Alpha's claims based upon the asserted breach of the Alpha-Jack Daniel distributorship contract, and upon the defendants' asserted tortious interference with business relations between Alpha and Jack Daniel. As determined above, however, the contract and tortious interference claims are without merit. Apart from those two elements, the antitrust claims at issue here are essentially grounded upon Jack Daniel's "refusal to deal" with Alpha after December 31, 1960.

■■■■ It is not a *per se* violation of the antitrust laws for a manufacturer or supplier to agree with a distributor to give him an exclusive franchise, even if this means cutting off another distributor. Joseph E. Seagram & Sons, Inc. v.

Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76 (9th Cir. 1969) *and cases there cited.* Moreover, without more, it is not a *per se* violation for the manufacturer or supplier to combine or conspire with others to make a change in its exclusive franchises, cutting off the supply of a former distributor. *Hawaiian Oke, supra,* at 76. Thus, in this case, the fact that Jack Daniel, with or without the encouragement of Brown-Forman, determined to change its exclusive distributorship from Alpha to Rathjen and the further contention that Jack Daniel, Brown-Forman, Rathjen, and others combined to make that decision have, standing alone, no antitrust significance.[12]

■■■■ The critical inquiry in such "refusal to deal" cases is not whether there was a refusal to deal, or whether a refusal to deal was carried out by agreement with others, but rather whether the refusal to deal, manifested by a combination or conspiracy, is so anticompetitive, in purpose or effect, or both, as to be an unreasonable restraint of trade. *Hawaiian Oke, supra,* at 77–78; Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 7 (9th Cir. 1963). This inquiry is primarily a factual one, and its resolution often requires determination of motive or intent. *Hawaiian Oke* and *Walker* both contain abundant discussion concerning the factual elements to be weighed in resolving the issue as do other cases dealing with the problem. *See, e. g.,* United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); Beverage Distributors, Inc. v. Olympia Brewing Co., 440 F.2d 21 (9th Cir. 1971); Scanlan v. Anheuser-Busch, Inc., 388 F.2d 918 (9th Cir. 1968).

■■■■ In the present case, the facts concerning the possible anticompetitive purpose or effect of the change in Jack Daniel's distributorship were very much in issue. The controversy pertained pri-

12. Thus we do not rely upon Jack Daniel's contention that the arrangement with

Rathjen came after termination of the Alpha distributorship.

marily to the possible effort of defendants and others to hamper competition by Schenley products which were also distributed by Alpha. (*See* note 14, *infra.*) Considerable evidence was presented by both sides. However, the findings of fact and memorandum opinion entered by the trial court bear almost entirely upon Alpha's breach of contract claim, and are devoid of all but the most peripheral references to the factual issues presented on the antitrust claims. The single conclusion of law entered on both the state and federal antitrust claims recites only that defendants are entitled to judgment thereon. With the record in this state, we are unable to decide whether *the decision of the district court on these claims is correct.*

Findings of fact are required under Rule 52(a), F.R.Civ.P. The findings should be explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision. Irish v. United States, 225 F.2d 3, 8 (9th Cir. 1955). *See* Civil Aeronautics Board v. Friedkin Aeronautics, 246 F.2d 173 (9th Cir. 1957). If the findings fail to provide such an understanding and a factual basis for the conclusion, the appellate court may appropriately vacate the judgment and remand the cause to the district court for supplemental findings of fact.

The appellate court is not the trier of facts and does not ordinarily make findings of fact. *Friedkin, supra,* at 177; *Irish, supra,* 225 F.2d at 8. *See* United States v. Marchese, 341 F.2d 782, 793–795 (9th Cir. 1965). We are cognizant of the rule that, where a full understanding of the issues can be reached without the aid of findings, this court is not required to remand the judgment because of the district court's failure to comply fully with Rule 52(a). Seligson v. Roth, 402 F.2d 883, 887 (9th Cir. 1968).[13] However, the failure of the district court to make findings on the antitrust claims in the present case leaves us without basis for decision on crucial factual issues in the face of voluminous and contradictory evidence in the record.[14] As a consequence, we have no way of knowing whether the district court's decision in favor of defendants on those claims was based on resolution of the determinative facts in their favor; or whether the court erroneously concluded that a switch in the distributorships could, under no circumstances have antitrust implications. *See Walker, supra,* 323 F.2d at 6–8.

We therefore conclude that supplemental findings of fact and appropriate conclusions of law must be entered with respect to the antitrust claims. Nothing in this opinion is intended to suggest what those findings and conclusions should be.

In summary, we reverse the judgment insofar as it awards recovery to Alpha on the first (contract) claim; affirm the decision of the court in favor of Jack Daniel and Brown-Forman on the third (tortious interference) claim, but

---

13. We apply this rule, in fact, in affirming the district court judgment for defendants on the third claim, for tortious interference with business relations. The findings of fact have little relevance to that claim, but our review of the record and our examination of the applicable law, both indicated above, are sufficient to give us a clear understanding of the issues on that claim. We have, accordingly, proceeded to a decision on those issues.

14. There was extensive testimony concerning Jack Daniel's motive for terminating Alpha's distributorship. Alpha contends the action was taken, at least in part, in anticipatory retaliation against the Schenley distilleries, whose products Alpha carried, thus implying an anticompetitive motive. Jack Daniel and Brown-Forman, on the other hand, contend that Jack Daniel terminated because of Alpha's financial position vis-à-vis Schenley, as a matter of sound business judgment. The findings make no reference to the issue, which we think critical in determining whether Jack Daniel's termination was anticompetitive in purpose or effect. This single example is not necessarily the only fact determination which the district court should make on remand.

remand the cause with directions that such decision be reflected in the decretal provisions of an amended judgment; and request the district court to make supplemental findings of fact and appropriate conclusions of law, reflected in the decretal provisions of the amended judgment, with regard to the second and fourth (antitrust) claims, which decretal provisions shall also reflect an award in favor of Jack Daniel in the sum of $36,885.00 upon its uncontested counterclaim. Either party may appeal from the amended judgment, but only insofar as it disposes of the second and fourth claims, in which event the appeal may be heard upon the present record and briefs as appropriately supplemented.