**BAY CITY–ABRAHAMS BROS., INC.,**
**Plaintiff,**

v.

**ESTEE LAUDER, INC., Defendant.**
**No. 73 Civ. 4207 (JMC).**

United States District Court,
S. D. New York.
May 17, 1974.

Marshall C. Berger, New York City (Hahn, Hessen, Margolis & Ryan, New York City, of counsel), for plaintiff.

Michael Malina, New York City (Ira H. Block, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for defendant.

CANNELLA, District Judge:

Defendant's motion for summary judgment, Fed.R.Civ.P. 56(b), is granted and the Clerk of the Court is directed to enter judgment dismissing the complaint.

The court grants the instant motion because plaintiff has failed entirely to state a claim upon which relief may be had. No state of facts which might constitute a cause of action cognizable at law has here been advanced.[1] In order

---

1. Plaintiff, in addition to the legal arguments raised in opposition to the present motion, challenges the propriety of the entry of summary judgment, in any event, by asserting that questions of intent and motivation have been raised and that such give rise to questions of fact. Poller v. Columbia Broadcasting System, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Accepting this position as a correct statement of the law, such rule is without impact in the present case.

For the reasons set forth in the text of this opinion, the court has concluded that, accepting as true the version of facts asserted by plaintiff and ascribing to defendant such motives and intent as plaintiff places upon it, there exists no legal theory upon which the relief here sought may be granted. Under such circumstances, the court finds the entry of summary judgment to be proper and fully warranted.

The propriety of summary judgment in instances such as that at bar was recently discussed by the Ninth Circuit in Bushie v. Stenocord Corp., 460 F.2d 116, 118–119 (9 Cir. 1972), wherein the court stated:

The principal question that arises on a motion for summary judgment is whether factual issues of legal significance—"material facts"—remain to be resolved at trial. Rule 56(c), F.R.Civ.P., provides that summary judgment shall be granted where the record shows "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It is not enough for the party opposing the motion for summary judgment merely to point to disputes of fact. As this court observed in McGuire v. Columbia Broadcasting System, Inc., 399 F.2d 902, 905 (9th Cir. 1968), "The showing of a 'genuine issue for trial' is predicated upon the existence of a legal theory which remains viable under the asserted version of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law."

that the decision of the court, as embraced in the succeeding paragraphs, may be placed in better perspective, the court now briefly outlines the factual setting of this case. The defendant, Estee Lauder, Inc., is a manufacturer of cosmetics, toiletries and related products. It advertises and promotes these products in the United States and elsewhere and sells them to a limited number of customers for resale at retail. In or about July, 1971, defendant commenced selling its products for resale at retail to a department store located in Bay City, Michigan, known as Sams Brothers. At that time Mr. Kamel Sams was the President and principal owner of Sams Brothers.

In or about late October or early November 1972, Mr. Sams advised defendant that he intended to sublease the cosmetics department here involved, as well as other departments of the store, to plaintiff, Bay City-Abrahams Bros., Inc., effective November 1, 1972, with Mr. Jim Wolfe thereafter to act as plaintiff's representative. Upon receipt of this advice, defendant ceased further shipment of its products to the Sams Brothers store and notified both Mr. Sams and Mr. Wolfe that until such time as it had determined that the Sams Brothers store, under its new management or ownership, was a desirable account and outlet for the retail sale of the Lauder product line, it would not solicit or accept orders for Lauder products from the store and would, until further notice, consider the store's account closed.

Following these events and while this change of control at Sams Brothers was in progress, in mid-November 1972, the Wm. C. Wiechmann Company, Inc., the owner and operator of two retail department stores in the Bay City-Saginaw, Michigan area, made inquiry as to whether defendant would sell it Estee Lauder products for resale at retail. In March, 1973, full management, operation and control of the Sams Brothers store passed to the plaintiff. In July, 1973, defendant determined and announced that it would not sell its products to plaintiff, Bay City-Abrahams Bros., Inc. and that it would sell its products for resale at retail to the Wiechmann's Store located in a shopping center situated between Saginaw and Bay City. Upon defendant's refusal to reconsider this decision, plaintiff commenced the instant action.

In the present suit, plaintiff asserts three claims against Estee Lauder arising from the latter's refusal to sell its products to plaintiff for resale at retail: (1) That such refusal "constitutes an intentional infliction of injury to plaintiff by defendant without justification"; (2) That such refusal constitutes "a contract or combination in restraint of trade or commerce among the several states in violation of § 1 of the Sherman Act" (15 U.S.C. § 1); and (3) That defendant's actions deprived plaintiff of promotional payments and services provided by defendant to other retailers in violation of Sections 2(d) and 2(e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(d), 13(e).

As phrased by plaintiff's counsel:

Lying at the heart of this litigation is the question of what motivated Lauder to make this decision [the decision not to deal with plaintiff]. The facts known to plaintiff and the documents produced by Lauder point to Lauder being motivated by a desire to retal-

*See also,* First National Bank v. Cities Service, Inc., 391 U.S. 253, 88 S.Ct. 1575, 20 L. Ed.2d 569 (1968); Coniglio v. Highwood Services, Inc., 495 F.2d 1286 (2 Cir. April 17, 1974); Arney v. United States, 479 F.2d 653 (9 Cir. 1973); Daily Press, Inc. v. United Press International, 412 F.2d 126 (6 Cir.), cert. denied, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); Zenith Vinyl Fabrics Corp. v. Ford Motor Co., 357 F.Supp. 133 (E.D.Mich.1973); McCaskill v. Texaco, Inc., 351 F.Supp. 1332 (S.D.Ala.1972), aff'd, Mem. sub nom., Harrelson v. Texaco, Inc., 486 F.2d 1400 (5 Cir. 1973); Beckman v. Walter Kidde & Co., 316 F.Supp. 1321 (E.D.N.Y.1970), aff'd per curiam, 451 F.2d 593 (2 Cir. 1971), cert. denied, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972).

iate against plaintiff for its discharge on December 28, 1972 of the head of its cosmetics department, Mrs. Barbara Krause. It would appear that Mrs. Krause was a close personal friend of Mrs. Elaine Watford, the Lauder sales representative for the territory including Bay City. Mrs. Krause made statements prior to her discharge that if she was discharged plaintiff would close the Lauder line. When the owner of Weichmann's called up to inform plaintiff that it was getting the Lauder line, he asked for plaintiff's opinion of Mrs. Krause as an employee. Despite an adverse recommendation, Weichmann's employed Mrs. Krause as the manager of its Lauder department. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 4. This assertion, together with the further facts here relevant, will be more fully explored in the succeeding paragraphs.

Proceeding then to the substantive merits of the claims asserted by plaintiff, the court turns first to plaintiff's cause of action which sounds in tort; specifically that allegation which characterizes the defendant's conduct as "an intentional infliction of injury to plaintiff by defendant without justification." Complaint ¶ 29. In this regard, it must be noted that the parties have agreed that the substantive law of the State of Michigan is applicable and controlling upon the tort issues here presented.[2] Plaintiff contends that the claim advanced in the first count of the complaint sufficiently states a cause of action upon either one or both of two theories of tort liability: (1) *prima facie* tort; and (2) intentional falsehood giving rise to damages or injurious falsehood.

## THE PRIMA FACIE TORT CLAIM

Looking first to the claim predicated upon the doctrine of *prima facie* tort, the relevant factual assertions made by plaintiff are briefly summarized: Estee Lauder determined not to sell its products to plaintiff solely in retaliation for plaintiff's discharge of Barbara Krause as cosmetics buyer at Sams Brothers.[3] On such facts, plaintiff argues that, as a matter of law, the courts of Michigan have neither accepted nor rejected the doctrine of *prima facie* tort and, therefore, that this court (sitting as a "court of Michigan") should apply the doctrine as it has been developed by the courts of New York.[4]

Judge Levet, of this court, has well stated the essential elements of a *prima facie* tort under New York law: (1) "There must be an intent to injure plaintiff, at least to the extent of infliction of *wrongful* harm upon plaintiff without just cause or excuse"; (2) "[j]ustification may be viewed as a neutralizing factor that overrides the intent to injure"; and (3) "[d]amages, which must be specially pleaded." Appalachian Power Co. v. Amerian Institute of Certified Public Accountants, 177 F.Supp. 345, 349–350 (S.D.N.Y.), aff'd, 268 F.2d 844 (2 Cir.), cert. denied, 361 U.S. 887, 80 S.Ct. 158, 4 L.Ed.2d 121 (1959) (and the cases therein cited). *See also,* Glenn v. Advertising Publications, Inc., 251 F. Supp. 889, 906 (S.D.N.Y.1966); Beardsley v. Kilmer, 236 N.Y. 80, 140 N.E. 203 (1923); Annotation, 16 ALR3d

---

2. Plaintiff's Memorandum of Law on Choice of Law at 1.

3. Complaint ¶ 19. *See also,* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, *supra,* at 4.

4. The *prima facie* tort, as it presently exists within the corpus of American jurisprudence, can well trace its origins in this country to the opinions and writings of Mr. Justice Holmes. In what has become a classic statement, the Justice, in Aikens v. Wisconsin, 195 U.S. 194, 204, 25 S.Ct. 3, 5, 49 L. Ed. 154 (1904), declared, "prima facie, the intentional infliction of temporal damage is a cause of action, which, as a matter of substantive law, whatever may be the form of pleading, requires a justification if the defendant is to escape. . . ." *See also,* Holmes, "Privilege, Malice, and Intent", 8 Harv.L.Rev. 1 (1894); Forkosch, *infra,* 42 Cornell L.Q. 465; Annotation, 16 A.L.R.3d 1191 (1967).

1191 (1967) (extended discussion of New York cases); Prosser, Law of Torts § 130 at 949 et seq. (4 ed. 1971); Forkosch, An Analysis of the "Prima Facie Tort" Cause of Action, 42 Cornell L.Q. 465 (1957); Note, Abstaining From Willful Injury—The Prima Facie Tort Doctrine, 10 Syracuse L.Rev. 53 (1958); 4 Restatement of Torts § 762 at 36.

■ In assessing the present state of Michigan law concerning the *prima facie* tort and in asserting that the courts of that state would follow the New York approach, plaintiff has erred. The Supreme Court of Michigan in Krause v. Hartford Accident & Indemnity Co., 331 Mich. 19, 49 N.W.2d 41 (1951), quoting directly from Professor Cooley's treatise on the law of torts, laid to rest, at least in Michigan, the *prima facie* tort, when it stated:

> Bad motive, by itself, . . . is no tort. Malicious motives make a bad act worse, but they cannot make that a wrong which in its own essence is lawful. An act which does not amount to a legal injury cannot be actionable because it is done with a bad intent. 3 Cooley on Torts (4th Ed.), § 534, p. 545.

*Id.* at 49 N.W.2d at 44. The entire context of Professor Cooley's remarks, as made in the section cited by the court in *Krause,* leaves no doubt in the mind of this reader that the Michigan court intended, by the words employed, to reject the *prima facie* tort doctrine. Indeed, it is now a settled and accepted proposition of law in Michigan that:

> Conduct which does not, either by itself or because of the manner of its exercise, constitute an invasion of the rights of another, is not tortious, however bad or malicious the actor's motives; conversely, where an act is an unprivileged invasion of rights, the absence of malice or the presence of a good motive does not render it any less of a tort.

22 Michigan Law & Practice Encyclopedia, Torts § 2 at 88.[5]

The case of Wilkinson v. Powe, 300 Mich. 275, 1 N.W.2d 539 (1942), does not, as plaintiff contends, lead to a contrary result. In that case, involving a dairy's refusal to further deal with a trucker which had, in the past, hauled milk to the dairy, the court allowed the trucker to recover upon a cause of action for tortious inducement of breach of contract with regard to a handful of farmers who were not subject to a written hauling contract with the plaintiff. The court noted that with respect to these few farmers "[p]laintiff certainly had an understanding with them, and there is no testimony to show that they would not have continued to employ plaintiff to haul their milk if defendants had not interfered." 1 N.W.2d at 543. In the opinion of this court, *Wilkinson* can be said to stand for no more than a slight enlargement of the classic boundaries of tortious inducement of breach of contract, so as to embrace the incidental and few non-contracting farmers; the case did not involve nor did the court there speak to or consider the *prima facie* tort.

■ From the foregoing, it is clear that the law of Michigan does not include within its corpus the so-called *"prima facie* tort" and, therefore, that aspect of plaintiff's claim so sounding, accepting as true the facts asserted by plaintiff, is insufficient as a matter of law and is dismissed.

5. Other authority similarly indicates that the courts of Michigan have refused to adopt the doctrine of *prima facie* tort. *See,* Forkosch, *supra,* 42 Cornell L.Q. at 479–80; Note, 56 Mich.L.Rev. 1219, 1222, n. 32 (1958); Annotation, *supra,* 16 A.L.R.3d 1191; *cf.,* Monohon v. Smith & Loveless Division, Union Tankcar Co., 343 F.Supp. 810 (E.D.Mich. 1972) (rejecting, as a matter of Michigan Law, the tort of intentional inducement of noncontinuance of a fiduciary duty); Bonkowski v. Arlan's Department Store, 383 Mich. 90, 174 N.W.2d 765 (1970) (defining malice in the context of an action for libel and slander, as "a wrongful act committed intentionally against [a] person without legal justification or excuse"); Prosser, *supra,* § 130; 4 Restatement of Torts, *supra,* § 762.

## 1212

### THE INJURIONS FALSE-HOOD CLAIM

In addition to predicating the instant tort claim upon the doctrine of *prima facie* tort, plaintiff contends that a recovery is here warranted under the tort of intentional falsehood giving rise to damages, or, in other terms, injurious falsehood. Specifically, plaintiff seeks that this Court embrace, as a matter of Michigan Law, the tort of injurious falsehood as it has been delimited by the Appellate Division, First Department, in Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co., 7 A.D.2d 441, 184 N.Y.S.2d 58 (1 Dept. 1959). *See also*, Prosser, *supra*, § 128 at 915 et seq.; 4 Restatement of Torts, *supra*, § 873; Restatement of Torts, Second, Tentative Draft No. 13, § 623A at 6 et seq. (1967). The court rejects this position for two reasons. First, the Michigan authorities now extant fail to support either the view that injurious falsehood is a basis for a recovery in tort or that the Michigan courts would, in the appropriate case, adopt the doctrine as a matter of substantive law. Secondly, assuming *arguendo* that the Michigan courts would apply the concept of injurious falsehood to the present case, plaintiff has failed, on the facts asserted, to state the essential elements of such a cause of action, both under the New York and Restatement views.

Plaintiff asserts the following state of facts as basis for recovery upon an injurious falsehood: In April, 1973, defendant's Regional Sales Representative, Mrs. Watford, directed a written memorandum to her immediate superior, Mr. Warner Byrum, defendant's District Sales Manager, wherein she stated that plaintiff was "still thinking that there is a possibility of receiving an Estee Lauder franchise". To that memorandum, Mr. Byrum added a handwritten note, which directed that Mrs. Watford wait for three months and then inform plaintiff "No for future". Prior to her receipt of this handwritten endorsement, Mrs. Watford continued in, what plaintiff contends to be, "the Lauder policy of creating false hopes in plaintiff by writing plaintiff that 'we will finalize our evaluation of the tri-county area very soon, and I will be back in touch with you'." [6] Plaintiff argues that this letter and this intracorporate memorandum, read together, indicate that Lauder was intentionally misleading plaintiff in order to delay any sale by plaintiff of products manufactured by defendant's competitors.

The point of departure for the court's present inquiry is the decision of Appellate Division, First Department, in the *Penn-Ohio* case, *supra*, wherein the court stated:

> The utterance or furnishing of false and misleading information may be actionable if done maliciously or with the intention to harm another, or so recklessly and without regard to its consequences, that a reasonably prudent person should anticipate that damage to another will naturally flow
>
> . . . .
>
> Usually, the utterance of a truth does not provide a basis for redress and imports no wrongdoing, and consequently is not actionable unless, as in prima facie tort, the sole motivation is the intentional infliction of harm resulting in damage . . . . That is not so, however, when the medium that inflicts harm resulting in damage is an untruth. By its very nature a false statement intentionally made is wrongful. If it inflicts material harm upon another, which was or should have been in the contemplation of the actor, and it results in actual damage to the plaintiff's economic or legal relationships, an action may lie . . . . It logically follows that to sustain a complaint, it is not necessary that the pleading must allege that the defendant was solely motivated to injure the plaintiff. It is

6. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, *supra*, at 5.

enough if the falsehoods charged were intentionally uttered and did in fact cause the plaintiff to suffer actual damage in his economical or legal relationships. [Citations omitted]

184 N.Y.S.2d at 61. *See also*, Glenn v. Advertising Publications, Inc., *supra*, 251 F.Supp. at 906–907; Squire Records, Inc. v. Vanguard Recording Society, Inc., 25 A.D.2d 190, 268 N.Y.S. 2d 251 (1 Dept.) appeal dismissed, 17 N.Y.2d 870, 271 N.Y.S.2d 301, 218 N.E. 2d 336 (1966), aff'd mem., 19 N.Y.2d 797, 279 N.Y.S.2d 737, 226 N.E.2d 542 (1967); Morrison v. National Broadcasting Company, 24 A.D.2d 284, 266 N. Y.S.2d 406, rev'd on other grounds, 19 N.Y.2d 453, 280 N.Y.S.2d 641, 227 N.E. 2d 572 (1967); Gersh v. Kaspar & Esh, Inc., 11 A.D.2d 1005, 206 N.Y.S.2d 510, 511 (1 Dept. 1960); Gale v. Ryan, 263 App.Div. 76, 31 N.Y.S.2d 732 (1 Dept. 1941); Goldstein v. Garlick, 65 Misc.2d 538, 318 N.Y.S.2d 370 (Sup.Ct., Queens 1971); Henkin v. News Syndicate Co., 27 Misc.2d 987, 210 N.Y.S.2d 302, 304 (Sup.Ct., New York 1960), aff'd mem., 19 A.D.2d 862, 243 N.Y.S.2d 667 (1 Dept. 1963); Prosser, *supra*, § 128; Restatement of Torts, *supra*, § 873; Restatement of Torts, Second, Tentative Draft No. 13, *supra*, § 623A. These authorities make clear the requirement that the false statement involved be made within the context of a tripartite relationship; publication of the alleged false statement is an essential element of injurious falsehood. As Dean Prosser states:

> The falsehood must be communicated to a third person, since the tort con-

sists of interference with the relation with such persons. Prosser, *supra*, § 128 at 920.

Proposed Section 623A of the Second Restatement,[7] which directly succeeds Section 873 of the First Restatement[8] and which makes specific reference to *Penn-Ohio* in the "Note to Institute" which follows the statement of the rule, *Restatement of Torts, Second*, Tentative Draft No. 13, *supra* at 7, is in complete accord with Dean Prosser's approach,[9] as are the leading New York authorities. *See, e. g.*, Gale v. Ryan, *supra*, 263 App.Div. at 78, 31 N.Y.S.2d at 734; Goldstein v. Garlick, *supra* 318 N.Y.S.2d at 374. *See also*, Felis v. Greenberg, 51 Misc.2d 441, 273 N.Y.S.2d 288 (Sup.Ct., Kings 1966).

■ On the facts here claimed, plaintiff does not demonstrate any publication of the alleged intentionally false matter; no communication to a third party has been asserted. At best, the facts alleged would reveal only the existence of certain of defendant's intracorporate communications and certain other conflicting communications between defendant and plaintiff. Such facts, if proved, would not suffice to bring defendant's conduct within the ambit of injurious falsehood.

Additionally, assuming *arguendo* that plaintiff had stated a viable cause of action for injurious falsehood, the court is not persuaded that the courts of Michigan would entertain the claim or allow a recovery thereon. Plaintiff, in support of the contrary position, relies upon Morgan v. Andrews, 107 Mich. 33, 64 N.W. 869 (1895). In that case, the

---

7. § 623A. LIABILITY FOR PUBLICATION OF INJURIOUS FALSEHOOD

(1) One who publishes an untrue statement of fact or opinion which he should recognize as likely to result in harm to interests of another having pecuniary value, through the action of third persons in reliance upon the statement, is subject to liability for pecuniary loss resulting to the other from such harm if, but only if,

(a) the publisher is motivated by ill will toward the other, or

(b) he intends to interfere with the interests of the other in a manner which he is not privileged to do, or

(c) he knows the matter to be otherwise than as stated, or that he has not the basis for knowledge or belief professed by his assertion.

8. Section 873 of the First Restatement was cited, in full, by the Court in Penn-Ohio, *supra*, 184 N.Y.S.2d at 61.

9. In this regard, it should be noted that Dean Prosser is the Reporter for the Second Restatement.

court held defendant liable to plaintiff for tortious interference with contract, where defendant had maliciously and without good cause persuaded a third party to reject a machine which it otherwise would have purchased from plaintiff. The holding in Morgan v. Andrews lends no comfort to the plaintiff here because that decision speaks only to tortious interference with contract, and does not address or support injurious falsehood as a substantive basis for recovery. In addition, *Morgan* involved a tripartite transaction of a nature not here extant. *See also*, 22 Michigan Law & Practice Encyclopedia, Torts, *supra* § 5 at 91.

Accordingly, and for the reasons stated in the foregoing paragraphs, the court concludes that plaintiff has not stated a cause of action for intentional falehood giving rise to damages or injurious falsehood and, therefore, that portion of the complaint asserting such claim is dismissed.

## THE SHERMAN ACT CLAIM

The court next proceeds to consider the first of two claims advanced by plaintiff under the federal antitrust laws; that defendant's refusal to sell its products to plaintiff constitutes "a contract or combination in restraint of trade" in violation of Section One of the Sherman Act, 15 U.S.C. § 1. In support of such claim, plaintiff asserts that Lauder's refusal to deal with it constituted a restraint of trade, in violation of Section One, and, additionally, that such refusal to deal was the direct result of an agreement between defendant and the Wm. C. Wiechmann Co. As is stated in paragraphs 25 and 26 of the complaint:

25. Shortly after defendant informed plaintiff of its decision not to sell its products to plaintiff, defendant entered into an arrangement with Wiechmann's, a retail store located in a shopping mall between Bay City and Saginaw, whereby defendant would sell its products to Wiechmann's.

26. As part of the arrangement between defendant and Wiechmann's Wiechmann's employed Barbara Krause as the Manager of its department for the sale of defendant's products.

Plaintiff further contends on the basis of these facts, that defendant invoked its economic power in order to dictate the employment policies of its customer, Wm. C. Wiechmann Co.[10] and that this action was also in illegal restraint of trade.

■ ■ Section One of the Sherman Act, 15 U.S.C. § 1, makes unlawful combinations, contracts and conspiracies in restraint of trade.[11] In this regard, it is settled that a manufacturer or producer has the right to deal with whom he pleases and to select his customers at will, so long as there is no resultant effect which is violative of the antitrust laws. A manufacturer may discontinue a relationship, or refuse to open a new relationship for business reasons which are sufficient to the manufacturer alone, and any adverse effect such decision may have on the business of the distributor is immaterial in the absence of any arrangement restraining trade or competition. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Bushie v. Stenocord Corp., 460 F.2d 116 (9 Cir. 1972); Alpha Distributing Company of California, Inc. v. Jack Daniel Distillery, 454 F.2d 442 (9 Cir. 1972); Beverage

10. Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, *supra* at 20. Specifically, plaintiff makes reference to the employment of Mrs. Krause as cosmetics department manager at Wiechmann's shopping center store.

11. Although Section One speaks in terms of "restraint of trade", the courts have long ago concluded that only such conduct as *unreasonably* restrains trade is to be proscribed; this is the rule of reasonableness. *See, e. g.*, Standard Oil Co. v. United States, 221 U.S. 1, 51, 31 S.Ct. 502, 55 L.Ed. 619 (1911); Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 638 (1918); Apex Hosiery v. Leader, 310 U.S. 469, 498, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); United States v. Arnold Schwinn & Co., *supra*, 388 U.S. at 374.

Distributors, Inc. v. Olympia Brewing Co., 440 F.2d 21 (9 Cir.), cert. denied, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971); Ricchetti v. Meister Brau, Inc., 431 F.2d 1211 (9 Cir. 1970), cert. denied, 401 U.S. 939, 91 S.Ct. 934, 28 L. Ed.2d 219 (1971); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9 Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L. Ed.2d 755 (1970); Daily Press, Inc. v. United Press International, 412 F.2d 126 (6 Cir. 1969), cert. denied, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); Scanlan v. Anheuser-Busch, Inc., 388 F. 2d 918 (9 Cir.) cert. denied, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6 Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L. E.2d 166 (1963), reh. denied, 375 U.S. 982, 84 S.Ct. 479, 11 L.Ed.2d 428 (1964); House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2 Cir. 1962); Zenith Vinyl Fabrics Corp. v. Ford Motor Co., 357 F.Supp. 133 (E.D.Mich. 1973); GAF Corp. v. Circle Floor Co., 329 F.Supp. 823 (S.D.N.Y.1971), aff'd, 463 F.2d 752 (2 Cir. 1972); Beckman v. Walter Kidde & Co., 316 F.Supp. 1321 (E.D.N.Y.1970), aff'd per curiam, 451 F.2d 593 (2 Cir. 1971), cert. denied, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972); Top-All Varieties, Inc. v. Hallmark Cards, Inc., 301 F.Supp. 703 (S.D. N.Y.1969). Mr. Justice Fortas stated in United States v. Arnold Schwinn & Co., *supra*, 388 U.S. at 376:

. . . [A] manufacturer of a product other and equivalent brands of which are readily available in the market may select his customers, and for this purpose he may "franchise" certain dealers to whom, alone, he will sell his goods. *Cf.* United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). If the restraint stops at that point—if nothing more is involved than vertical "confinement" of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the re-

striction, on these facts alone, would not violate the Sherman Act.

Assuming *arguendo* that defendant's refusal to deal with plaintiff was not unilateral, as defendant contends, but, rather, the product of an arrangement with Weichmann's, such agreement, standing alone, would continue to be an insufficient predicate for a Section One claim. If proved, such agreement might tend to demonstrate a rationale for defendant's conduct; to eliminate plaintiff as Wiechmann's competitor in the involved geographical area. But the existence of such agreement would not, of itself be sufficient to establish that defendant's motive for refusing to deal with plaintiff was anticompetitive and in unreasonable restraint of trade.

It is well settled that a manufacturer is free to agree with a third party to give him an exclusive distributorship "even if this means cutting off another distributor", Joseph E. Seagram & Sons v. Hawaiian Oke & Liquors, Ltd., *supra*, 416 F.2d at 76, so long as in so doing there is no resulting restraint of trade. *See, e. g.,* Bushie v. Stenocord, Corp., *supra*, 460 F.2d at 120; Ricchetti v. Meister Brau, Inc., *supra.* As was recently stated by the Third Circuit in Ark Dental Supply Co. v. Cavitron Corp., 461 F. 2d 1093, 1094 (3 Cir. 1972):

. . . [I]t is indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B and that such a transfer is valid even though B may have solicited the transfer and even though the seller and B may have agreed prior to the seller's termination of A.

*See also,* Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra,* 416 F.2d at 78; Alpha Distributing Co. of California, Inc. v. Jack Daniel Distillery, *supra,* 454 F.2d at 452; Bushie v. Stenocord Corp., *supra.*

This result is not altered by proof that the cutoff distributor was a "good dealer", as plaintiff contends

Sams Brothers was. No intent to restrain trade can be inferred therefrom: "[t]he most [that such] evidence suggests is that [Lauder] may have been mistaken in judging the quality of [Sams Brothers] performance." Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra*, 416 F.2d at 78. *See also*, Bushie v. Stenocord Corp., *supra*, 460 F.2d at 119–120. Equally well settled is the principle that such refusal to deal is not an unreasonable restraint of trade simply because the terminated dealer's business is injured or because the termination is wrongful under state law. Ace Beer Distributors, Inc. v. Kohn, Inc., *supra*, 318 F.2d at 286; GAF Corp. v. Circle Floor Co., *supra*, 329 F.Supp at 828.

A case strikingly similar to that at bar is Bushie v. Stenocord Corp., *supra*, wherein the Ninth Circuit affirmed the District Court's entry of summary judgment dismissing certain Sherman Act claims. The facts of *Bushie* may be briefly stated: Plaintiff was engaged in selling at retail and servicing defendant's office dictating machines in the Phoenix, Arizona area, pursuant to a distributorship contract with the defendant. Defendant decided to sell and service its machines in the area through its own outlet exclusively, and notified plaintiff that his distributorship contract was cancelled. In the interim, defendant engaged two individuals to operate its new branch office; one, a former independent dealer for a competitor's products in the Phoenix area, the other, his employee as a service technician. On these facts, plaintiff commenced an action against the defendant alleging, *inter alia*, a violation of Section One of the Sherman Act.

In *Bushie*, after first discussing the principles of law applicable to a claim for refusal to deal, *supra*, the Court of Appeals stated:

In connection with refusals to deal, the courts have found to be "arrangements restraining trade" such practices as refusal to deal to eliminate price-cutting dealers . . . to keep new competition out of a market . . . to enforce a tying arrangement . . . to create a monopoly in a product market . . . or to further strengthen an already dominant market position . . . . However, [plaintiff] has failed to show anything from which it might be inferred that [defendant's] actions restrained trade or were motivated by an anticompetitive intent. [Citations omitted]

460 F.2d at 119. To the same effect is a statement by the Court of Appeals for the Sixth Circuit in Ace Beer Distributors, Inc. v. Kohn, Inc., *supra*, 318 F.2d at 286: "A refusal to deal becomes illegal under the Act only when it produces unreasonable restraint of trade, such as price fixing, elimination of competition or the creation of monopoly". And, as that Court further stated, "[u]nless it can be said that the refusal to deal with plaintiff had the result of suppressing competition and thus constituted 're-straint of trade' within the meaning of Section 1 of the Sherman Act, there is no violation of the Act." *Id.* at 287. *See also*, House of Materials, Inc. v. Simplicity Pattern Co., *supra*, 298 F.2d at 871.

In the instant case, plaintiff, in support of the Section One claim asserted, relies upon the following factual propositions: That defendant has refused to deal with the plaintiff; that this refusal is the product of an arrangement between defendant and Wiechmann's; and, that "Lauder is using its economic power to dictate the employment policies of its customers." See, p. 1214, *supra*. Clearly, such contentions, even if fully proved, fall far short of that which is required to convert defendant's refusal to deal into an unreasonable restraint of trade of the nature denounced by the statute and by the cases.[12] Any contract, combination or

---

12. *See*, discussion pp. 23–24, *supra*. Plaintiff's contention that defendant invoked its

economic power in order to dictate the employment practices of its customers (Wiech-

conspiracy, which might now exist or which might have existed in the past between defendant and Wiechmann's or, have emerged from defendant's unilateral refusal to deal, has not been shown to have resulted in an unreasonable restraint of trade. As was made clear by the Supreme Court in First National Bank v. Cities Service, Inc., 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), allegations of unreasonable restraint of trade must be supported by "significant probative evidence" in order to overcome a motion for summary judgment. *See also*, Bushie v. Stenocord Corp., *supra*, 460 F.2d at 120. With regard to the present claim, plaintiff has entirely failed to produce any such "significant probative evidence", and, accordingly, and for the above stated reasons, it is dismissed.

### THE ROBINSON–PATMAN ACT CLAIM

The last claim asserted by plaintiff is that defendant's failure to furnish it with certain promotional services and allowances, provided by defendant to other retailers, violated Sections 2(d) and 2(e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(d), 13(e). The Court finds this claim to be wholly frivolous and devoid of merit and, as a matter of law, it is dismissed.

Sections 2(d) and 2(e) provide that:

(d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value *to or for the benefit of a customer* of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with processing, handling, sale, or offering for sale of any product or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms *to all other customers competing in the distribution of such products or commodities.*

(e) It shall be unlawful for any person to discriminate *in favor of one purchaser against another purchaser* or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms. [Emphasis added]

Plaintiff, although conceding that it was not defendant's "customer" or "purchaser" by virtue of any direct sale of merchandise pursuant to plaintiff's order placed with and accepted by defendant,[13] makes a two-pronged factual assertion in attempting to come within the purview of the sections set forth above. Plaintiff argues that the receipt, in its store, of defendant's merchandise ordered by and shipped to the store's former management (plaintiff's predecessor in interest) confers upon it status as defendant's "customer" or "purchaser", and, in addition, it asserts that plaintiff's predecessor was free to turn over its business to plaintiff without jeopardizing any right to receive

---

mann's employment of Mrs. Krause) falls clearly without the scope of the above discussed "unreasonable restraints of trade". Nor can such be said to constitute an illegal tying arrangement acting in restraint of trade. *See, e. g.*, Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Coniglio v. Highwood Services, Inc., *supra; cf.*, Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). In short, plaintiff urges upon the court a position contrary to the generally accepted proposition that the antitrust laws exist "to protect competition, not competitors." Checker Motor Corp. v. Chrysler Corp., 283 F.Supp. 876, 885 (S.D.N.Y.1968), aff'd, 405 F.2d 319 (2 Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); *cf.*, Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 705, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967) (Stewart, J.; dissenting).

13. Plaintiff's Rule 9(g) Statement ¶ 1.

**1218**

promotional services and payments from the defendant. In the latter regard, it is contended that certain shipments made by defendant pursuant to orders from the previous management of the store were, in fact, received and paid for by plaintiff, thereby making plaintiff a "customer" or "purchaser" within the meaning of the Act.

Thus, the initial and dispositive question posed to the Court on the present claim is whether the plaintiff was defendant's "customer" or "purchaser" within the meaning of Sections 2(d) and 2(e). In this regard, it should be noted that the term "customer" in Section 2(d) and the term "purchaser" in Section 2(e) (and 2(a)) are synonymous in meaning. American News Company v. F.T.C., 300 F.2d 104, 109 (2 Cir.), cert. denied, 371 U.S. 824, 83 S.Ct. 44, 9 L. Ed.2d 64 (1962); K. S. Corp. v. Chemstrand Corp., 198 F.Supp. 310, 312 (S. D.N.Y.1961). *See also*, D. Baum, The Robinson-Patman Act: Summary and Comment, p. 53 et seq. (1964). However, even were the meanings of these sections diverse, plaintiff would remain without their scope.

The classic and accepted definition of the term "purchaser" (or "customer") is found in Shaw's, Inc. v. Wilson-Jones Co., 105 F.2d 331, 333 (3 Cir. 1939), wherein Judge Biggs' stated:

The term purchaser means simply one who purchases, a buyer, a vendee. It does not mean one who seeks to purchase, a person who goes into the market-place for the purpose of purchasing. In other words, it does not mean a prospective purchaser, or one who wishes to purchase, as the appellant contends.

The appellant in its brief lays emphasis upon the fact that appellee had sold supplies to it in the past. . . . In short, appellant contends that it was a customer of appellee's and therefore a purchaser. . . . Past purchases or conversations in respect to possible future purchases are insufficient [to bring one within the scope of Section Two].

*See also*, Klein v. Lionel Corp., 237 F.2d 13, 15 (3 Cir. 1956); Naifeh v. Ronson Art Metal Works, 218 F.2d 202, 206, n. 6 (10 Cir. 1954), aff'g, 117 F.Supp. 690 (W.D.Okl.); Chicago Seating Co. v. S. Karpen & Bros., 177 F.2d 863 (7 Cir. 1949); Sorrentino v. Glen-Grey Shale Brick Corp., 46 F.Supp. 709, 711–712 (E.D.Pa.1942). As was stated by the District Court in Naifeh v. Robinson Art Metal Works, *supra*, 117 F.Supp. at 695:

In defining a purchaser as referred to in this Act care must be taken to distinguish between a purchaser, and one who is merely a past purchaser or a prospective purchaser.

Plaintiff, by its own concession, did not purchase from defendant, as that term is ordinarily employed. Rather, plaintiff, by the above-advanced arguments, attempts to pull itself up by the bootstraps to purchaser status. The court is not impressed. Having never been a "purchaser" or "customer" of the defendant, as those terms are defined by the cases, *supra*, plaintiff cannot become such by the receipt of merchandise ordered by and shipped to the store's prior management or by assuming its predecessor's inventory and making payment therefor.[14]

---

14. "[T]he right to refuse to deal, the statutory embodiment of the 'Colgate Doctrine', permeates the entire Robinson-Patman Act. One who is not a customer cannot claim the allowance or services which flow from Sections 2(d) and (e)." D. Baum, *supra* at 53.

A statement relevant to the matter at bar can be found in Naifeh v. Ronson Art Metal Works, *supra*, 218 F.2d at 206–207:

By the express terms of the Act, Ronson had the right to do business with whom it

pleased. As a private trader in interstate commerce, Ronson not only could select its own customers but also could refuse to sell its merchandise to anyone and by so doing would in no way violate the antitrust laws. It is settled law that a seller may either refuse to negotiate or may cease doing business with a customer without running afoul of the Act. . . . In this case Ronson sold its merchandise to Sooner for many years and in January of

The case of Hartley & Parker, Inc. v. Florida Beverage Corp., 307 F.2d 916 (5 Cir. 1962), relied on by plaintiff, does not support a contrary result. *Hartley & Parker* does not alter or amend the well-settled requirement that one be a "purchaser" or "customer" in order to invoke the protections of Section Two. As was stated in Becker v. Safelite Glass Corp., 244 F.Supp. 625, 635–636 (D.Kan.1965), wherein the Court granted summary judgment dismissing a similar Robinson-Patman Act claim:

> In our opinion, this language clearly demonstrates that 2(d) and 2(e) of Clayton/Robinson-Patman protect only competing customers or purchasers. . . . [A] plaintiff must be a *customer* who competes with the favored customer in order to recover under 2(d) or 2(e). . . .

At bar, it is uncontroverted that plaintiff has never been a customer of any of the defendants. . . .

[A]ssuming unequal treatment of defendants' customers, such facts are immaterial as a matter of law when it is admitted that plaintiff is not a customer and thus not under the shelter of 2(d) and 2(e) protection. We must conclude on the basis of uncontroverted facts before us that plaintiff has no status to ground a claim for relief on alleged violations of 15 U.S. C.A. §§ 13(d) and/or–(e).

This Court is similarly of the opinion that the plaintiff at bar is without status to assert a claim for relief under Sections 2(d) and 2(e) of the Robinson-Patman Act and, accordingly, such claim is dismissed.

Defendant's motion for summary judgment, Fed.R.Civ.P. 56(b), is granted. The Clerk of the Court is directed to enter judgment dismissing the complaint, with prejudice and with costs.

So ordered.

---

1952 decided to terminate their business relationship. Accordingly, it did not fill Sooner's orders after that time. The trial court found that Ronson had neither accepted the order of January 30, 1952, nor any of the orders submitted by Sooner after that date. Inasmuch as there was no basis either contractually or otherwise, whereby Ronson was bound to fill such orders, Ronson's conduct was not in violation of the Act. When the order was not filled within the effective time, Sooner was bound to know that it had not been accepted. . . .
Of course, Sooner was left with a depleted stock and some slow moving items, but that was a hazard Sooner necessarily took under the terms of the informal distributorship arrangement which had existed prior to January 30, 1952. Moreover, Ronson offered to permit Sooner to return the items which he did not wish to retain, at the price Sooner had paid therefor, less a transportation and handling charge and depreciation on certain items. . . .
Congress has been liberal in enacting remedies to enforce the anti-trust legislation. However, in no instance has it indicated an intention to interfere with ordinary commercial practices in interstate commerce which are bona fide and not in restraint of trade. . . . [Footnotes omitted]
*See also*, Colorado Pump & Supply Co. v. Febco, Inc., 472 F.2d 637, 641 (10 Cir.) cert. denied, 411 U.S. 987, 93 S.Ct. 2274, 36 L. Ed.2d 965 (1973); New Amsterdam Cheese Corp. v. Kraftco Corp., 363 F.Supp. 135, 141–142 (S.D.N.Y.1973); Tripoli Co. v. Wella Corp., 286 F.Supp. 264 (E.D.Pa. 1968), aff'd, 425 F.2d 932 (3 Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970); Ben B. Schwartz & Sons, Inc. v. Sunkist Growers, Inc., 203 F.Supp. 92, 99 (E.D.Mich.1962).
Plaintiff stands in no better shoes than would any other third-party—albeit a third-party which succeeds to and assumes a purchaser's inventory or obligations. Plaintiff's asserted position is not unlike that of a bank which advanced a buyer purchase money for inventory and which, thereafter, gained possession and ownership of such inventory (and the store) as the result of foreclosure of the lien thereby created. Plaintiff is no more a "purchaser" or "customer" of defendant than would be the bank and the bank, clearly, would not be one.